**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 4/16/26


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA

v.

CHARLES GLENN,

Defendant.

* * * * * * * * * * * * * * * * * *

No. 1:23-cr-00112-PB-AJ-1
August 20, 2025
10:30 a.m.

TRANSCRIPT OF MOTION TO SUPPRESS - DAY TWO

BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:

For the Government: David B. Joyce, AUSA
United Attorney's Office
Portland, ME

For the Defendant: Daniel Joseph Cloherty, Esq.
Cloherty & Steinberg LLP

Court Reporter: Brenda K. Hancock, RMR, CRR
hancockbrenda1@google.com

## I N D E X


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RICHARD SLAVIN | | | | |
| By Mr. Joyce | 4 | | 80 | |
| By Mr. Cloherty | | 37 | | |

| | Page |
|---|---|
| The Clerk noting correction to exhibit designations | 141 |

P R O C E E D I N G S

THE CLERK: All rise for the Honorable Court. Please be seated. This Court is in session and has for consideration day two hearing on a motion to suppress in criminal matter 23-cr-112-01-PB, United States of America versus Charles Glenn.

THE COURT: All right. Here's my plan. I want to first get the evidence in, and then we'll talk about the transfer request, the problems with the shoes and the CPAP machine, so I'll fully hear that, but I first want to just get the evidence in, and then we'll move on from there. Okay?

So, you have an additional witness to call?

MR. JOYCE: I do, your Honor. Good morning.

THE COURT: Go ahead and do that.

MR. JOYCE: The government calls Richard Slavin.

THE COURT: All right.

Come on up here, sir, right up on this side here, stand by the witness stand, and raise your right hand.

THE WITNESS: Thank you, your Honor.

THE CLERK: Remain standing and raise your right hand.

**RICHARD SLAVIN**, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: Thank you. Please be seated. Please state your full name and spell your last name for the record.

THE WITNESS: Sure. My name is Richard Slavin. It's S-l-a-v-i-n.

THE COURT: Go ahead.

DIRECT EXAMINATION

BY MR. JOYCE:

Q. Good morning, sir. Can you please tell us how you're employed.

A. I work for a company called ViaPath. I'm a senior field service manager there.

Q. How long have you worked for ViaPath?

A. Five years now.

Q. Were you employed -- what was your start date?

A. About February, I think the 28th, in 2020.

Q. What's your current role?

A. Senior Field Service Manager.

Q. What does that mean?

A. I take care of all the hardware on site. I'm also the -- let's say I'm the person that people report issues to that are first -- for triage.

Q. Do you have a supervisory role?

A. Yes, I do.

Q. Does ViaPath have a prior corporate name?

A. That would be Global Tel Link or GTL.

Q. Did that transition occur sometime during the pendency of your employment?

A. Yes, it did. Yeah.

Q. Sir, does ViaPath, the company, have a contract with the

New Hampshire Department of Corrections?
A. We do.
Q. Do you provide telephone communication systems used by inmates?
A. We do.
Q. Are you familiar with that system?
A. I am, sir.
Q. And in what capacity, or how is it that you're familiar with the system?
A. I work with it every day.
Q. Do you also supervise others who work with that system?
A. I do. I answer their questions when they have issues.
Q. Are you familiar with the manner in which inmates may request certain telephone numbers be recorded or registered to their accounts?
A. I am.
Q. Is there -- let's take it backwards a moment. If an inmate wishes to make an outgoing call is there a number that has to be registered before they may do so?
A. Only if it's an attorney or a number that needs to be marked "Private" for some reason. The resident needs to request that be marked "Private" before calling it.
Q. Okay. But if they're calling family and friends is there a limit on the number of calls they can make?
A. Yes. Well, there's a limit as to how many numbers they

can call at any one time, which is 20.

Q. And if an inmate wishes to add a 21st number to that list or 22nd number, what happens?

A. They usually request that we clear their call list, which we do, and then they have a -- they start off with zero numbers again.

THE COURT: Just to be -- I want to be sure I understand this. So, setting aside numbers on privileged matters, if an inmate has nobody on his existing call list he can dial any number he wants to?

THE WITNESS: That's correct, your Honor.

THE COURT: Okay. And the system keeps track of the numbers that an inmate calls, and when they call someone that gets added to what we're calling the "call list;" is that right?

THE WITNESS: It does.

THE COURT: And he can continue to call any number he wants until he has 20 numbers in the call list?

THE WITNESS: That's correct, your Honor.

THE COURT: And after that he can't dial any new numbers without clearing his call list?

THE WITNESS: That's correct.

THE COURT: Okay.

Q. And you mentioned attorney numbers earlier. Are those handled in a way that's any different from friends and family?

A. Yes. They would put in a request to have that number be made private. It would then go to one of my employees, who would open up a request for Investigations to look up that number.
Q. And Investigations, are those DOC employees and not ViaPath employees?
A. They are DOC employees.
Q. And what's the purpose of that investigation?
A. Excuse me?
Q. What's the purpose of the inquiry that's being made at that time?
A. Oh, it would just be to make sure it is indeed an attorney's number and it needs to be marked "Private."
Q. And we talked about the maximum number of 20 numbers. Do attorney numbers count toward that maximum, or are they treated separately?
A. They're actually treated separately.
Q. And if an attorney number is verified, what is then the difference in ViaPath's handling of calls to that number versus a friend or family number?
A. Yeah. One of my employees would mark it "Private," okay, which means that we don't record the call at all. It's not that we record it and don't give it; we just don't record it at all.
Q. And that's --

THE COURT: I'm sorry. I'd like to know a little bit more about the process. He says, It's marked "Private," and then, We don't record it at all. How does that actually work in this system?

MR. JOYCE: Okay. Thank you, Judge.

Q. So --

THE WITNESS: Well -- oh, do you want me to continue?

MR. JOYCE: Answer that question. Thank you.

THE WITNESS: Yes, sir. We have -- in our portal that we have that controls the phones we go into the inmate's PIN number, his account number. Then we would add a new PAN number. That's the new number that you call. It's called a PAN number.

THE COURT: PAN?

THE WITNESS: Yeah, PAN.

THE COURT: P-a-n?

THE WITNESS: P-a-n, yeah. And we add that PAN number, we mark it "Private," and that uploads to the cloud and says, Don't record this number; if that inmate calls that number, don't record it.

THE COURT: So, am I correct in understanding that there's software that is used in the system?

THE WITNESS: Yes, sir. The software is a service from a website.

THE COURT: Okay. And there is an indication your

company or someone working with the software can do to identify a call number as private?

THE WITNESS: Yes, sir.

THE COURT: And the way -- are you telling me the way the software works is, if a number is designated as private, the software operates in such a way that no recording will be made of the call?

THE WITNESS: That's correct.

THE COURT: All right. And so, there's no one, no human being that listens in to start deciding whether it's private or anything like that?

THE WITNESS: Oh, no, nothing like that, sir.

THE COURT: It's just, if there's a private indication, the software says, Don't record, and no recording is made. And is it also true that, unless there is a marking of "Private" the call will be recorded?

THE WITNESS: That's correct, sir. Yes.

THE COURT: So, there are only two options. If it's a "Private" indication it's not recorded; if there is not a "Private" indication and it's made by the inmate it's going to be recorded?

THE WITNESS: Yes, sir.

THE COURT: Okay. All right.

MR. JOYCE: Thank you, Judge.

Q. And under the system that we've been discussing, sir,

whose obligation is it to initiate the process to identify a privileged or private number?

A. That would be on the resident, sir.

Q. That's the -- the "resident" meaning the inmate?

A. The inmate, sir, yes.

Q. Is there a process that you're familiar with by which attorneys can have a blanket designation of their own numbers across all of their clients?

A. Not that I'm aware of, sir.

Q. So, if an attorney represents multiple inmates, is it the case that each inmate individually has to identify that phone number as being associated with their counsel?

A. That's correct, sir.

THE COURT: I don't know if your company does this or not. I recall reading a case in a different jurisdiction than this one. I don't know whether it is -- involves your company's software or not. My recollection of the case was that in that jurisdiction there was some effort to identify people who are members of the bar, admitted to practice, and their calls would not be recorded. Is that at all familiar to you?

THE WITNESS: I mean, there's other calls that we have that aren't recorded, like a PREA call, for instance.

THE COURT: What's a PREA call?

THE WITNESS: The Prison Rape Elimination Act. So, if

someone wants to report some sort of misconduct, obviously we, you know, wouldn't want to record that, because then potentially the person who did the misconduct could listen to it.

THE COURT: How would the system know that that call is not to be recorded?

THE WITNESS: We would flag that number right at the beginning of the install, actually. Any numbers like PREA and stuff like that we flag right at the beginning, saying, Don't record these numbers, and it is all-encompassing for that organization.

THE COURT: Okay. But what you're telling me is there is no generalized indication. Like, the system is not designed to and does not operate in such a way that, if someone is admitted to the bar and has an office phone number, that that office phone number automatically goes into the system and any call to that number is not recorded?

THE WITNESS: Nothing like that, your Honor.

THE COURT: Nothing like that. Okay.

Yeah, you'll have a chance.

THE DEFENDANT: Your Honor, I need to say something. I spoke about discovery that is explicitly talking about what you are speaking about, where it says, We have -- We keep a list, GTL, we keep a list, Your attorney's not on the list that we keep.

THE COURT: Okay.

THE DEFENDANT: It's what you're bringing up right now. My attorney doesn't have that information here today. He didn't call witnesses. He's fired. It's that simple.

THE COURT: Okay.

THE DEFENDANT: He's fired.

THE COURT: We'll deal with that.

THE DEFENDANT: No, we're going to deal with that. He's fucking fired. I'm done.

THE COURT: Mr. Glenn, do you want to take a few minutes?

THE DEFENDANT: Yeah, let's take a few minutes. I got life in prison. Let's take as long as we fucking need. He's fired, though. He didn't call Robin Melone.

You were very specific last time: I don't want -- you said, I don't want these assertions of affidavits in the court. If we have witnesses, I want them here, I want to talk to them. He didn't call Robin Melone, who can't get on the stand and say anything other than, The call wasn't recorded, or she didn't know it was being recorded. He didn't call her, because he wants to tap dance around the fact that she's an attorney. He's fired. It's that simple.

THE COURT: Okay.

THE DEFENDANT: Give me a fucking attorney that actually -- is actually ready to be adversarial against other

attorneys. If not, we take as long as we want. You can send me back to the jail. I'm done.

THE COURT: All right. We'll take a break. Take him back --

THE DEFENDANT: Fucking done. You're fired, motherfucker.

THE COURT: Take him back to --

THE DEFENDANT: Get the fuck out of here, fucking bitch.

THE COURT: All right. We'll take a break. Hang on, sir.

THE DEFENDANT: I'll fucking drop this motherfucker, man.

THE COURT: We'll take about a five-minute break. I'll come back and --

THE DEFENDANT: He's fired. It's that fucking simple.

THE COURT: We'll meet initially with just counsel in the courtroom.

THE DEFENDANT: Fuck (inaudible) man. Fucking bitch-ass motherfucker.

(The defendant exited the courtroom)

MR. JOYCE: The witness has left. I assume you don't want the witness here.

THE CLERK: Yeah.

THE COURT: Yeah.

MR. JOYCE: Your Honor, the case agent's in the courtroom as well. Is it okay if he remains, or would you like him to step outside?

THE COURT: Why don't we have him step outside. It isn't going to concern the substance, but I want to find out your position as to how you would like me to proceed with respect to Mr. Glenn.

MR. CLOHERTY: I guess the difficult -- look, I'm here. I represent him until the Court tells me I don't represent him. I'm here, prepared.

THE COURT: The Court's not going to tell you that you don't represent him, so that is not an option that is open to you at this point.

MR. CLOHERTY: Yeah, I understand that. He -- I heard what he had to say.

THE COURT: Let me suggest that an idea here is give him a few minutes to calm down and see if he would be willing to talk with you about how he would want to proceed.

MR. CLOHERTY: Sure.

THE COURT: If he is insistent on trying to fire you, I'll hear him out, but I'm going to make clear to him he needs to remain calm. I don't want him swearing, I don't want him raising his voice, I don't want him standing up when he's not asked to stand up, and if he can abide by those conditions, I'll hear him out --

MR. CLOHERTY: Sure.

THE COURT: -- on his request to discharge you. As I've said, and this is no surprise to Mr. Glenn, I've already given him three lawyers that, in my view, were highly competent, well qualified. If there's a specific issue where you and he disagree that he wants to discuss with me, I'm willing to hear him out on that. Absent information that I don't currently have, there is no reason to excuse you as his attorney. He may be in a situation where his options remain represent himself or have you as his attorney, because without some new information I'm not able to conclude that you are unable to effectively represent him in these matters.

But I need him to understand, and I want to give him a chance to calm down, I will not tolerate that kind of behavior, and, if need be, I'll continue the proceeding without him, if he's not willing to behave the way I require him to behave. If he's willing to behave the way I require him to behave, I'll hear him out on this particular concern, and then we will try to move on. But he's very upset now. I don't think it makes sense to force him to do anything for a minute. Let's let some time pass, see if his temper cools.

I would suggest that you make an attempt to meet with him, and I'll ask the Marshals Service to facilitate that --

MR. CLOHERTY: Sure.

THE COURT: -- if he's willing to meet with you, and

then you and he can discuss this particular concern, and you can tell him that, If you really want to try to fire me again, the judge is willing to hear you out, but he's told me and will repeat to you this has to be conducted in a civil way, and, if he's not able to do that, then I'm not going to hear him on that today; I'm simply going to go forward with the proceeding.

Because I was informed a little before 9:00 today that the defendant was initially unwilling to come to court, I had to start doing some preliminary research about when someone voluntarily absents themselves from the Court proceeding and what a court should do, and there is, as you well know, there is a body of law that addresses that issue, and I certainly hope we don't get there. But I'm not going to delay proceedings anymore here; I'm going to move forward. I'll hear the defendant, if he's civil and appropriate with me, but I'm moving along, and if he's not able to behave civilly and appropriately, I'm not going to keep delaying the proceedings, and I'll explain that to him when the time comes.

You haven't been around long -- neither of you have been through this with me and the defendant, but I have over a substantial period of time exhibited tremendous patience with the defendant, and I have shown that I am willing to listen to his arguments, but I'm not going to delay the proceedings any further, and I don't have any other option, if he is not willing to be cooperative, other than to tell him I'm going to

go without him.

Now, I really think it would be a mistake for the defendant to represent himself, but, given his decision to try to fire multiple lawyers, if I determine that I can't fire you, then I probably will advise him that I'm not going to fire you, and he doesn't get to fire you. I will decide whether you will be his lawyer or not. But if he does not want to have you as his lawyer his only other option is to represent himself, because I'm not going to appoint new lawyers unless there is some reason why you have been constitutionally ineffective.

So, I think that's where we are. I think give him some time, see if you can talk to him, try to persuade him that I am willing to hear him. I am willing to hear him. If he wants to fire you, I'll hear him on that. If he wants to have a transfer to another institution, I'll hear him on that. I know he's frustrated about the shoes and the CPAP, and I'll hear him on that, but I'm not willing to delay the proceedings.

As I heard him, and it was amidst a lot of swearing and yelling and stuff, he seems really -- he seems frustrated and suggests that he had either obtained or sought and didn't obtain some discovery about the way the system worked. What seemed to have set him off was the witness describing how the recording system works, and he seems to be upset, that he said something about discovery, about the very questions you were asking, and I was just asking just basic questions about the

recording system.

Do you know -- is there anything you can tell me about that to help me better understand what the problem is?

MR. CLOHERTY: At this point, and I hear the Court's counsel, I will try to meet with him. I'm not aware of discovery that's been required or requested that has not been produced to the defense. I suppose there's always more discovery out there that I haven't perhaps thought of, but I'm here, prepared to proceed today, and so -- but I don't want to say more without conferring with Mr. Glenn.

THE COURT: I don't want to put you in a difficult position in any way. I'm trying to make sense of what it is that upset him so much today. It may be this underlying issue about, I want to transfer, I want my CPAP, I want my shoes but --

MR. CLOHERTY: There may be another issue. If we get there, it's probably more appropriate for an *ex parte* hearing, but I think my preference would be to speak with Mr. Glenn first.

THE COURT: Okay.

MR. CLOHERTY: And then, if he insists on the proceeding that you proposed, I assumed that would be *ex parte* in front of the Court.

THE COURT: Yeah. What I would do is I would excuse government counsel, clear the courtroom, put the matter under

seal, but you need to prepare him that my willingness to do that depends on his willingness to comply with my instructions about what I expect from him. I want to be civil with him; I want him to be civil with me. I won't always agree with what he says, but I will listen, but I will not engage with him further if he's going to behave in the way he just behaved. It's a danger to you, to the marshals, for him to be that out of control in his responses, so I won't tolerate that.

MR. CLOHERTY: I appreciate the Court's sentiment. I do want to be clear I don't feel danger with respect to Mr. Glenn, and we have had many meetings. I met with him shortly before court today, and I don't feel danger, but I understand the Court's --

THE COURT: I have a larger obligation, and I just won't conduct proceedings with someone who behaves in that way, and I can't do my work, I can't fairly process arguments that are being made to me in that way, and I won't entertain them. So, if he wants to talk to me about firing you and he can do it in a civil way, I will talk to him about that, but if he can't do that my decision is I'm just not going to engage with him on it, and I'll consult both of you about whether to proceed with the testimony or not. But my inclination is, and I believe I have the authority to conclude, that I should just conduct the proceeding without him, and, if I do that, I'll do it in such a way that I will keep a record of the proceeding, and I'll have

a transcription be made of the proceeding, and it will be made available to him. He'll continue to have opportunities to meet with you. But the better way to do it is to deal with me civilly and to raise his concerns. He's very smart and able to express himself in a thoughtful way, and he's done that with me many, many times, and if he can do that I'll listen to him.

MR. CLOHERTY: Practically speaking, your Honor, I don't know exactly the mechanics of the courthouse. Is he back downstairs?

THE COURT: Yes.

MR. CLOHERTY: Is there a lock --

THE COURT: They probably did not -- they probably took him back down. I'm not certain.

THE CLERK: There's a deputy in the courtroom.

THE COURT: Do you know where -- is he down back, in the normal --

THE DEPUTY U.S. MARSHAL: I would imagine he's probably in the immediate cell holding area here.

THE COURT: Oh, he is. Okay. But you would want him to meet with his lawyer downstairs?

THE DEPUTY U.S. MARSHAL: Typically, we would prefer the interview rooms, but I think under the circumstances, if the Court would --

THE COURT: If you're okay with it.

THE DEPUTY U.S. MARSHAL: -- I would allow him to go

back here. We will be somewhat out of earshot, but we will -- we're going to have to be in this cell block area here.

THE COURT: So, understand the way that we normally would do these interviews would be they take him downstairs. There's a place. I don't know if you met with him.

MR. CLOHERTY: Yes, I have. It would be my preference to have that level of privacy, if possible. I know it may be cumbersome for the marshals.

THE COURT: Yeah. I guess -- obviously, he wants the privacy. I don't believe Mr. Glenn is going to behave violently towards his lawyer. I think he is just very angry. But if you determine that's appropriate and counsel would prefer it, that would be my preference.

THE DEPUTY U.S. MARSHAL: Yes, your Honor. We'll move him to the interview room when you're ready.

THE COURT: Okay.

MR. CLOHERTY: Yeah. I want to be clear my concern isn't my proximity to Mr. Glenn. It was just the marshals might be in earshot of attorney-client privilege.

THE COURT: Right. I know exactly what you're saying. Especially in a case like this, where we're litigating issues of whether his privacy rights were respected, I want him to feel comfortable that he can communicate with you out of the earshot of anybody associated with the government. So, that's where we are. We'll see. We'll bring him back -- you'll bring

him downstairs. At that point perhaps you should tell him that, Your lawyer would like to meet with you. Are you willing to meet with your lawyer in a conference room? And if he is, then I think you should go and talk with him.

The goal would be to tell him, Look, if you want to fire me, the judge has said he's willing to hear you *ex parte* about it, but just keep in mind the judge has made clear to me it has to be done in a way that is the way we normally interact, which is calmly, civilly and respectfully to each other, and if you can do that he'll hear you. If you don't think you can do that, you need to let me know, because the judge isn't going to tolerate it. And he'll hear you, and then he will make a decision about whether you should be excused or not, and then we'll decide on what the next steps are in finishing up the evidence in the case.

And if he wants to raise in the *ex parte* something about the issue of, I was trying to get discovery -- because it may be a lawyer who predates you. There may be some -- like, he may have wanted a prior lawyer to subpoena records from the system operator and he didn't get -- the lawyer didn't do it, and he's mad about that. I can hear him out on what those things are.

So, let's see what we can do, Counsel. I appreciate that you're in a difficult position, and I know you have your client's interest at heart, I'm confident in that, and I want

to try to facilitate your ability to work with your client, to the extent I possibly can, but there are limits to what I can do here, and we're getting close to reaching those limits.

MR. CLOHERTY: I certainly understand, your Honor.

THE COURT: All right. Let's see what happens. You'll notify the clerk when you've had your conversation, and if he's willing to abide by my requirements and he wants to be present, we can bring him into the courtroom. Jen will call me, I'll come down, we'll do this *ex parte* thing.

We'll bring you back in when we're finished with that. Okay?

MR. JOYCE: Thank you, Judge.

THE COURT: All right.

THE CLERK: All rise.

(Recess taken from 11:05 a.m. to 11:25 p.m.)

(Sealed *ex parte* proceedings)

IN OPEN COURT

THE CLERK: You want the witness brought back up?

THE COURT: Yes, please.

I'll just make clear I have evaluated Mr. Glenn's request that he be allowed to fire his lawyer. I have determined that it is not appropriate to do that at this time, so we're going to continue.

MR. JOYCE: Yes, your Honor.

(The witness retook the stand)

THE COURT: So, go ahead when ready, Counsel.
MR. JOYCE: May I approach --
THE COURT: Yes.
MR. JOYCE: -- with an admitted exhibit, your Honor?
THE COURT: Yes.
MR. JOYCE: Thank you.

CONTINUING DIRECT EXAMINATION BY MR. JOYCE:

Q. Sir, I have put before you what's been previously marked and admitted as Government Exhibit No. 4. Do you recognize that document?
A. I do, sir.
Q. And can you tell us what that is, please?
A. These seem to be inmate requests to staff to do things like clear PAN lists or to report that the phone app or the tablet's not working, but this is how the resident reports issues to us.
Q. Okay. And is this consistent with what you would expect to see for inmate requests as a ViaPath employee?
A. Yes, it is.
Q. And among the other things that could happen here are clearing phone lists, or adding attorneys, or adding other numbers; is that right?
A. That's correct, yes.
Q. Are you familiar, sir, with warnings that are played on calls when they're initially commenced over the ViaPath system?

A. Yes, I am, sir.
Q. Can you sort of describe what the process is when an inmate picks up the phone and what he hears and what the person on the other end hears as a call is initiated?
A. Sure. The resident, inmate, would pick up the phone, they would be asked if he wants to make an English or Spanish or make a language choice. Then it would ask if he wants to make a collect or a debit call. If you make a debit call, it would then have you enter in your PIN number and your second PIN for security, and it would ask you what number you want to call. At that point you'd enter in your ten-digit number, if it's the United States dialing plan, and you would -- then there would -- the system would make the call, but it kind of, it mutes you at that point, okay? So, when the called party picks up the phone it's going to say, You have a call from a person at the New Hampshire Department of Corrections, and it might play the recorded name, press 1 -- zero to accept it or 1 to refuse it, or you can just hang up on it. If you press zero to accept it and it is a nonprivate call, so it's not marked, "Do not record it," it would then tell both parties, This call is -- the call is subject to monitoring and recording. If it's a private number, that second spiel of recording just doesn't play at all.
THE COURT: Just again to be clear, am I correct in understanding that it's your testimony that this happens as a

matter of software operation; it happens automatically based on what the inmate does?

THE WITNESS: Yes, sir.

THE COURT: Okay.

MR. JOYCE: Your Honor, if I could play just the warning in Government Exhibit No. 1.

THE COURT: Yes.

MR. JOYCE: And ask the witness some questions as we go through it.

THE COURT: Yes.

MR. JOYCE: Thank you.

Q. So, I'm going to play for you what's been admitted as Government Exhibit No. 1, sir.

(Audio recording played)

Q. So, I'll just, I'll stop right there. You could hear it -- I believe it started to say "For English," and then it cut off. Is that right?

A. Yes, sir.

Q. So, if a person is familiar with the system and they enter their prompt as the voice is speaking, does it terminate the prompt and proceed to the next one?

A. It does, sir.

(Audio recording played)

Q. What is that balance referring to? That's the inmate's?

A. Yeah, the balance on their phone account. Correct.

Q. So, at this point the call hasn't connected, and only the inmate is hearing that. Is that right?
A. That's correct, sir.
THE COURT: Has the number been dialed at that point?
THE WITNESS: He started to do it right there, I believe.
Q. I'll continue. I'll back up a moment.
(Audio recording played)
Q. Is that the dialing?
A. That's the dialing.
(Audio recording played)
Q. So, at this point we hear "Please wait while your call is being connected." The inmate has dialed the telephone number, and now the transmission to the receiving party is about to begin; is that right?
A. That's correct.
(Audio recording played)
Q. Who hears the "Please hold" after the ringing?
A. The inmate will hear the "Please hold," but then everything after that next is -- the inmate can't hear it. When they're asked to press zero to accept or press 1, the resident's not hearing that.
(Audio recording played)
THE COURT: Can I stop that?
MR. JOYCE: Please.

THE COURT: Are you saying -- so the number has been dialed.

THE WITNESS: Yes, sir.

THE COURT: All right. Someone has at that point picked up, or when they say "Please hold" is it waiting and ringing for the other person to pick up?

THE WITNESS: When it says "Please hold," then it starts the call to the called party.

THE COURT: Okay. Can you go back, and I just need to go through that again from the point we have the dialing.

(Audio recording played)

THE COURT: Stop. I thought there was a "Please hold" before that. Is there an earlier "Please hold"? I want to know from the time we hear him going click, click, click, click.

MR. JOYCE: Yes, sir.

THE COURT: Run that and stop after the first "Please hold."

(Audio recording played)

THE WITNESS: You want to go a little before that.

THE COURT: Go back before that.

(Audio recording played)

THE COURT: Stop. So, I haven't heard the ring. I haven't heard the ring tone, right? I heard them pressing the numbers, right?

THE WITNESS: Yes.

THE COURT: Then it says "Please hold."

THE WITNESS: Yes, sir.

THE COURT: That's before there's been a connection to the person to whom the call is placed, correct?

THE WITNESS: That's correct, your Honor.

THE COURT: Okay. That's what I was getting at.

MR. JOYCE: Okay.

THE COURT: There's dial the number, "Please hold." At that point there's been no connection to the other side, so the only people that can hear -- person that can hear that is the inmate placing the call?

THE WITNESS: That's correct, your Honor.

THE COURT: Okay. Now play it to the next "Please hold" from there.

(Audio recording played)

THE COURT: Stop. All right. I hear a phone ringing. Is that the ringing of the attempt to place the call?

THE WITNESS: It is.

THE COURT: Okay. At that point, where there's a second "Please hold," has the connection gone through to the person receiving the call?

THE WITNESS: That "Please hold," the called party at the other end is now lifting up the phone, or it's their voicemail picking up. Something's picking up that call.

THE COURT: Okay. So, something is picking up. And the "Please hold" is heard by the inmate?

THE WITNESS: I believe so, yes, sir.

THE COURT: Okay. Is it also -- if someone has picked up the phone at that point will they -- they will not hear the "Please hold"?

THE WITNESS: They don't. They hear what's coming up right after this, though.

THE COURT: Okay. So the inmate hears the "Please hold," the person picks up. Now what's next?

(Audio recording played)

THE COURT: Stop. Does both the inmate and the person receiving the call hear the "Hello --

THE WITNESS: No.

THE COURT: -- this is a prepaid..."?

THE WITNESS: Just the called party at this point.

THE COURT: Okay. So, when there is a recording of this call it is a recording where some of the things are heard by the person receiving the call that are not heard by -- that are not heard by the inmate?

THE WITNESS: That's correct, sir.

THE COURT: And there are some things heard by the inmate that are not heard by the person receiving the call?

THE WITNESS: Yeah, a couple of things in there at the beginning.

THE COURT: Let's go through. I need to know exactly right through the whole call what is heard. All right?

MR. JOYCE: Thank you.

Q. So, is it fair to say that anything before the person receiving the call picks up the phone, they wouldn't hear any of that?

A. The person receiving the call? Correct. That is correct.

Q. So, everything we've heard in the tape up until the person answers the phone and the second "Please hold" is heard by the inmate only?

A. That's correct, sir.

Q. And it's your testimony that the second "Please hold" is heard by whom?

A. Yes, sir.

Q. By whom?

A. It's by the inmate, the second "Please hold.

Q. Okay. And then we heard, "This is a call from," and I believe it was blank in this one?

A. That's right, it was.

THE COURT: All right. Let me stop you.

THE WITNESS: Okay.

THE COURT: Who hears the "This is a call from"?

THE WITNESS: The called party, the outside.

THE COURT: The called party. And the blank, why aren't we hearing who the call is from?

THE WITNESS: When you first set up your phone account it asks you to record your name. If they didn't record it, or it just recorded silence at that point, that's what we would play.

THE COURT: So, the silence here is because Mr. Glenn hadn't set up his phone so the person would hear "This is a call from Mr. Glenn"?

THE WITNESS: Yes, sir. Yeah.

THE COURT: Okay. So, that silence is what the person on the receiving end of the call would hear?

THE WITNESS: Yes, sir.

THE COURT: Not the person on the -- not the inmate.

THE WITNESS: Not the inmate, sir.

THE COURT: Okay. All right. Go ahead. We'll go step by step.

(Audio recording played)

Q. Who hears that part?

A. The called party.

Q. Only?

A. Only.

(Audio recording played)

Q. It sounded like it started to say "To accept;" is that right?

A. Yes, it is.

Q. Would that be the complete version of that recording, it

would have said, To accept press something, to refuse press something else?

A. That's right. And then, if you press the something else, I think it says --

THE COURT: It preempts the full message and immediately -- -

THE WITNESS: That's right, sir.

THE COURT: -- so someone would have clicked "accept" at that point?

THE WITNESS: Yes, if it was a person and not like a voicemail or something like that answering.

THE COURT: Yeah. And that's because it stops, right --

MR. JOYCE: It does, your Honor.

THE COURT: -- before you get the full acceptance out, and that would indicate someone on the receiving end had done something to indicate accept.

THE WITNESS: Yes, your Honor.

THE COURT: Okay.

(Audio recording played)

THE COURT: Play that back again.

(Audio recording played)

THE COURT: Go back a little further.

(Audio recording played)

THE COURT: I'm sorry. Go back a little further.

MR. JOYCE: Where would you like me to --

THE COURT: From the point at which the person says "To accept" and before "accept" is completed it's cut off.

MR. JOYCE: Okay.

THE COURT: At that point -- I'm understanding the person has accepted the call at that point.

THE WITNESS: Yes.

THE COURT: And let me ask -- just ask you there. After that says "accept" who hears everything else that follows on the recording?

THE WITNESS: After they have accepted the call both parties hear everything; they're connected.

THE COURT: So, your position is that everything after that -- after the recipient clicks "accept" anything that is recorded is heard by both parties?

THE WITNESS: That's correct, your Honor.

THE COURT: Okay. Go ahead.

(Audio recording played)

Q. That's the end of the warning, is, "Thank you for using Global Tel Link;" is that right?

A. Yes, sir.

THE COURT: All right. So, and, again, your position is this is all computer software that determines how these operations work?

THE WITNESS: Yes, sir.

THE COURT: And that's the way it's programmed to work --

THE WITNESS: That is correct, your Honor.

THE COURT: -- with respect to recorded calls? Okay.

Q. And in advance of your testimony here today did you make a test phone call from the system to verify what happened?

A. Yes, your Honor. Yes, sir.

Q. And what, if anything, did you learn?

A. I didn't learn anything really knew. I knew ahead of time, but I figured, if I'm going to court, I'd better check it anyways, due diligence, and once they press zero to accept the call that call is connected at that point, both parties are hearing that call.

The part where it's, you know, the "Thank you" stuff, the beginning part of, you know, You have this much in your balance and that part, that's all heard by the inmate, and after they press the zero to accept that's when the called party can hear it.

Q. And is this the same -- is the system the same or largely similar now as it was in December of 2020?

A. Yes, it is.

MR. JOYCE: All right. That's all I have, your Honor. Thank you.

THE COURT: All right. So, Counsel, what is your preference here? If you have a relatively brief, 15-minutes or

less -- my reporter I don't want to be overstressed here. If you think it will be longer than that, we might as well take a short lunch break.

MR. CLOHERTY: My guesstimate, just looking at what I have, might be -- it's probably more than 15 minutes, might not be as long as a half an hour.

THE COURT: I think it might be useful to take the lunch break now. Then, Mr. Glenn can chat with you at some point about what he might want you to cover, and you can decide whether to do it or not.

MR. CLOHERTY: I'm happy to do that, your Honor, and Mr. Glenn, I'm sure, would like to chat with me.

THE DEFENDANT: I'm happy to do that also, your Honor.

THE COURT: Yeah. I think it will just give you that opportunity to kind of get your ducks in a row as to what you want to cover.

MR. CLOHERTY: Yeah. Sure.

THE COURT: Okay. So, that is -- let's take a short lunch break. Let's see. 1:15 come back, and we'll complete the testimony, and then we'll have argument, and then I'll deal with the issue of Mr. Glenn's request for a transfer.

MR. JOYCE: Fair enough, your Honor.

THE COURT: We'll do that after we're done with this. I'll probably take this issue under advisement, and, as I said, I'll give you a little time to look at what the record is, and

if you have any additional materials you want to submit or something, I'll give you a chance to at least raise that as an issue.

Okay. We'll take a short break.

MR. CLOHERTY: Thank you.

THE CLERK: All rise.

(Lunch recess taken from 12:30 p.m. to 1:25 p.m.)

THE CLERK: All rise for the Honorable Court. Please be seated.

THE COURT: Okay. Cross-examination.

MR. CLOHERTY: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CLOHERTY:

Q. Good afternoon, Mr. Slavin.

A. Good afternoon, sir.

Q. We haven't met before other than a shake of the hand outside of the courtroom today?

A. That's correct.

Q. Okay. Sir, I just -- frankly, His Honor asked a lot of the questions I was going to ask, but I do want to sort of start. You gave a lot of testimony before we broke about who heard what during the course of the call that was played for you by government counsel, right?

A. Mm-hmm. Yes, sir.

Q. And I just want to be clear. That testimony was based on

sort of your understanding of how the system's supposed to work, right?
A. Well, actually I did test calls and verified it, so --
Q. Correct. And you did your own test calls --
A. I did.
Q. -- and at least you, when you did your test, it performed the way you understand the system was supposed to work, right?
A. It did, sir, yes.
Q. I just want to clarify you didn't participate in the call in any way --
A. No.
Q. -- on December 1st, 2020, right?
A. That's correct, sir. I did not.
Q. And you can't testify about who heard what at any particular time on that date, right?
A. I guess not.
Q. Right. You're testifying about your understanding of how the system, as you understand it, is supposed to work, right?
A. Yes. It works that way for everybody, yeah.
Q. Okay. And I think you testified that you've worked for ViaPath, slash, GTL for more than five years; is that right?
A. Yes, sir, right before COVID.
Q. And fair to say one of your job responsibilities there is to make sure that all service issues relating to the telephone products that you provide are completed in a manner that

complies with the contracts --
A. Exactly.
Q. -- that you have with the corrections facilities, right?
A. That is correct, sir.
Q. And here we're talking about a contract between GTL, slash, ViaPath and the New Hampshire Department of Corrections; is that right?
A. Correct, sir.
Q. Okay. And so, I don't want to belabor this, because I do think the Court worked hard at this, so I don't want to waste too much time on this, but I just want to sort of understand it, and I might ask government counsel to replay that message, but, first of all, when an inmate or a detainee places a call using the system to call outside the facility, that call is not connected immediately, right?
A. No. That person on the other side hears that same spiel and has to accept it.
Q. Right. I'll walk through the spiel again.
A. Okay.
Q. Not to belabor it too much, but I hope you bear with me, because I just want to make sure I understand your testimony.
A. Yeah, absolutely.
Q. In fact, there's a series of steps that happen before the call is connected, right?
A. That's correct.

Q. Okay. And so, I think we heard first, or at least certainly early on, there's a prompt about language, right, about language? Do you recall that?
A. You mean -- yeah. The IVR? I mean, what the -- the computer is talking to the person?
Q. Yeah. I'm sorry if my question isn't clear. When an inmate makes a call one of the first things they hear --
A. Oh, yeah.
Q. -- is a prompt --
A. Yeah. Language choice. Yes, sir.
Q. -- language. Is that right?
A. That is correct.
Q. And fair to say only the inmate hears that, right?
A. That is correct, sir.
Q. Nobody else hears that?
A. No one can hear that.
Q. Okay. And then I think there's a prompt -- I don't think we have to replay it -- that includes an inmate ID number. Is that right?
A. That's correct, sir.
Q. Okay. And, again, only the inmate hears that, right?
A. Correct.
Q. And that's, of course, the call hasn't connected yet, right?
A. No, sir.

Q. In fact, the call hasn't even been dialed in, so, of course, only the inmate hears that, right?
A. That's correct.
Q. Okay. And then there's -- I think we heard it; again, I don't need to replay it -- there's information about their current balance; is that right?
A. That's correct, sir.
Q. And who hears that?
A. The inmate does.
Q. Okay. And then there's a prompt that says, Please enter the area code and phone number, or something close to that, right?
A. Correct.
Q. Okay. And I take it, again, that's something only the inmate hears; is that right?
A. Correct, sir.
Q. Okay. And then, and this gets to -- now we get into it, and then we hear "Please hold"?
A. Right.
Q. And I'll play it again, if you want it, or if the Court wants me to play it again.
THE COURT: Feel free to, if you think it would be helpful.
MR. CLOHERTY: Okay.
THE COURT: I was confused initially, so that's why I

wanted to hear each little part of it, but if you want to play it again I don't have any problem with --

MR. CLOHERTY: I understand, your Honor. Not yet, but I may get to that.

Q. But that's the first time it says "Please hold," and that, if I think I understand your testimony before, that is heard only by the inmate. The call has been dialed, but you hear a "Please hold," and that is directed only to the inmate. Right?

A. That's correct.

Q. Okay. I think it was at this point, or maybe I'm wrong, and you can clarify, you said that at some point the inmate is muted; is that right?

A. Well, we don't really connect the call until the called party presses zero to accept it.

Q. Sure. I'm not asking about that, though.

A. Okay.

Q. I'm not asking about the connection. We'll get there. I want to understand -- you said the inmate -- I believe your testimony was that I think the inmate is muted, and so is the inmate at this point in the call, once it says "Please hold," are they muted, in other words no -- the inmate can't say anything that would be recorded or the system wouldn't record anything spoken on the inmate's end?

A. When I said "muted," I actually meant, referred to no one on the outside can hear him, okay? So, until that, like I

said, until the person accepts the call no one can hear the resident.
Q. Okay. Well, then, let me ask this question: Prior to that period, after that first "Please hold," if the inmate were to continue to speak, recognizing maybe the call isn't connected, would that be recorded by the system?
A. To be honest with you, I don't know about that.
Q. Okay. We then hear a call, a quote, I guess, on this -- what is it called, the prompt or a preface?
A. Yeah, you can call it a prompt or -- in technical terms IVR, integrated voice response, but a prompt is fine.
Q. Okay. It says, Please wait until your call is being connected, or, excuse me, Please wait while your call is being connected. Right?
A. Mm-hmm. That's correct.
Q. And who hears that?
A. The resident.
Q. Okay. Obviously, just the inmate, because it's the inmate's call that is being connected again --
A. Mm-hmm.
Q. -- at least according to your testimony hasn't been connected yet. And then -- and I think you clarified this. I didn't know this until you testified about this, but at some point the system knows the detainee's name, right?
A. Yes. When they first set up their phone account they're

asked to record their name.
Q. Okay. So, that's not something that happens at this stage of the proceeding; that's something that the system already has when the system --
A. It sets it up when you first call.
Q. Okay. And so, going a little bit back in time earlier in this call sequence, the inmate has put in his or her ID number, and is it based on that, the recording of their name?
A. Correct. That ID number is the same as their account number for the phone system.
Q. Okay. And in at least the example that we heard there was nothing, and that means perhaps the inmate did not record the name back when they set it up --
A. That's correct.
Q. -- is that right? But that's not something that happens during a particular call, right?
A. No, no. It's once at the beginning, unless we're requested to reset the recorded name for some reason.
Q. Okay. Then, again, if my sequence is wrong, correct me, and I want to understand, at that point the phone rings, right?
A. Yes. After they tell them to hold, and if the call goes through, you know, sometimes international calls have trouble, but if the call goes through, the ringing, and the phone at the other end is ringing, yeah.
Q. Okay. So, the phone at the other end is ringing?

A. Right.
Q. But we hear on the recording the ringing, right? I think we heard that.
A. Yes.
Q. I'll play it again, but I think we hear the ringing.
A. Yeah.
Q. Who hears the telephone ringing? I want to understand.
A. I believe -- to be honest with you, I'm not really sure about who hears the actual ringing of that, okay?
Q. But certainly it's heard on the recording?
A. It is, yeah.
Q. But you don't know whether the inmate hears it?
A. I do not, know. I should have paid a little better attention to that, sure.
Q. Okay. Now, then, and I think this is -- the Court caught this, too, and I was trying to understand. Once the phone stops ringing, then we hear again "Please hold," we hear another "Please hold," right?
A. Mm-hmm.
Q. Right?
A. Yes, sir.
Q. Okay. And my question to you is who hears that --
A. I believe it's the resident does.
Q. -- inmate?
A. The resident, inmate.

THE COURT REPORTER: I'm sorry. I'm sorry. You spoke over each other.

MR. CLOHERTY: Fair enough. Let me just ask the question again.

Q. Once the phone stops ringing, it says "Please hold," and I think you testified that then that's another sound that the inmate hears, right?

A. Yes, sir.

Q. Now, when the phone stops ringing, presumably someone on the other end has picked it up, right?

A. Correct, sir.

Q. And every call is different?

A. Yeah.

Q. But not infrequently that person might pick up the call and say, Hello, right?

A. That's correct.

Q. But the recording doesn't capture that, does it?

A. No, it doesn't. It will just go into the, You have a call from an inmate at the New Hampshire DOC.

Q. I didn't mean to cut you off. I want you to answer the question, but the reason I said that -- I'm going to ask you about that sequence.

A. Oh, okay. Yeah.

Q. But I just want to understand -- I'm trying to understand the technology here, that, when the person picks up, whatever

that person might say or might not say doesn't get recorded; is that right?

A. No, it doesn't.

Q. Okay. And I think you're saying that person doesn't even hear the "Please hold," right?

A. The second "Please hold" or the first one?

Q. The second "Please hold."

A. The second "Please hold"? I believe that they do hear it, yes.

Q. So, that's one that both the inmate and the --

A. Yes.

Q. -- recipient hear?

A. That's correct.

Q. Okay. Sure about that?

A. You know what? Not 100 percent on just the "Please hold." I wasn't listening to the "Please hold" when I was doing that.

Q. Okay. I don't want you to testify about anything you don't know.

A. Yeah, yeah, yeah, yeah.

Q. If you don't know, you don't know.

And then the next part -- I guess at this point I'm just curious -- the call at least has been connected, right?

A. As the person picks up -- the person's picking up the phone on the other end.

Q. Right. So, now we have at least active phone lines on

both ends, right?
A. Oh, yeah, yeah. Before they get connected they do have to hit that digit to enter to start.
Q. I'll ask you about the digit, but at least there's active phone lines on both ends, correct?
A. Correct.
Q. And then -- I guess my question is at that point do you understand whether the caller and the recipient can hear each other?
A. No, no.
Q. They can't?
A. No, they can't.
Q. Okay. And I think you testified until that zero is hit later in the sequence they can't hear each other, right?
A. That's correct, sir.
THE COURT: And I think Mr. Glenn testified as to why that is, because inmates are going to jump -- they're afraid inmates will jump in and communicate in that period, so they design it so they can't hear, which makes perfect sense to me when he explained it.
Q. The Court detected a little bit where I was going, but is that right? Was there an earlier time when, in fact, earlier in the sequence the two could communicate?
A. No.
Q. So, you don't recall, I mean, that there was any -- ever a

period where the inmates and the recipient could quickly speak before the --

A. No.

THE COURT: You mean sometime in the past?

MR. CLOHERTY: Sometime in the past, yes.

THE COURT: Before --

THE WITNESS: Oh, like before my time at ViaPath?

THE COURT: In earlier versions of systems like this, I don't know whether your company ever did, there's some suggestion here that they were susceptible to misuse by inmates, because before they went through the full acceptance process and the warning there would be an opportunity for -- like, it used to be the case when you'd try to make a collect call back when there were pay phones and things, people would start to make the collect call, and they didn't want to have to -- the person wasn't going to accept, so they'd just shout their message out before the reject came out, and as a way around it your system protects against that, and he's just asking was there ever a case while you were employed by the company where that was an issue that the software had to be addressed -- changed to address.

THE WITNESS: Thank you, your Honor. I have to clear that up. Not since I've been an employee of ViaPath.

Q. Okay. Not to your recollection?

A. Yes.

MR. CLOHERTY: But I appreciate your Honor's point.

THE COURT: It used to happen with -- that's how far back I go.

MR. CLOHERTY: That's how far back I go, too, your Honor. I remember those days.

THE COURT: Your client had raised his hand. You might want to just check with him.

THE DEFENDANT: No, no. I'm fine.

THE COURT: You're okay? Okay.

MR. CLOHERTY: Okay. Fair enough. Okay.

Q. So, at that point I think the next message in the sequence, if I have it right, is a message that says, "Hello, this is a prepaid debit call from" name, and in the example that counsel played for you there was no name, but that's the next part of the sequence that occurs, right?

A. Correct, sir.

Q. And who hears that?

A. The called party does.

Q. Okay. And does the inmate hear that, or does the detained person hear that?

A. They do not.

Q. Okay. So, at this point all the sound is just going to that end of the call; is that right?

A. No, no, no. Wait a minute. They do hear the first part, not the second part.

Q. And so, what are you describing?
A. You've got a call from so and so. I believe they hear that.
Q. Okay. And that's all I'm asking.
A. Yeah.
Q. Right now that's the portion I'm asking for --
A. Okay.
Q. -- which is, "Hello, this is a prepaid debit call from" name.
A. That's right.
THE COURT: Because I do think you testified differently on direct. My recollection is that on direct you testified that that would be heard by the recipient only.
A. No. The second part about the call being recorded is heard by the recipient only.
THE COURT: Can we actually play the portion so there's no confusion about what's happening, because I'm now -- I'm confused.
MR. CLOHERTY: I understand that. Why don't I have --
THE COURT: I'll ask the government.
MR. CLOHERTY: Yeah, if the government can play the same -- why don't you start --
Do you mind if I consult with my client?
THE COURT: Yeah, go ahead.
(Pause)

MR. CLOHERTY: So, probably easiest just to start at the beginning.

THE COURT: Yeah. Can we just go step by step through it so there's -- I need to know, because I think he --

THE WITNESS: Yeah, I think I did screw it up just then. I'm sorry about that. I wrote it down.

THE COURT: Just let me do this step by step.

THE WITNESS: All right.

THE COURT: Let's play each declarative statement or sound. After that is done, stop, and if he has questions about that you can ask it. Let's just go step by step through it.

MR. CLOHERTY: Sure. If it's fair, your Honor, I'll let it play. I just don't want to belabor it. I think I got clear answers at least up to the ringing.

THE COURT: Okay. Do you want to skip through -- where do you want to start?

MR. CLOHERTY: Why don't we stop right at the second "Please hold," just so we don't have to redo --

THE COURT: Okay. So, can government counsel just find that stop?

MR. JOYCE: I'll try to get close. Yes, sir.

MR. CLOHERTY: It's only a minute, if we have to listen to it.

MR. CLOHERTY: Start there. That's fine.

(Audio recording played)

THE COURT: Stop.

MR. CLOHERTY: Okay. Stop that.

Q. Okay. And I think you've already testified about that, that that's something that the inmate hears?

A. That's right.

Q. And can you tell me whether the recipient hears it, or you don't know?

A. Nothing yet. Yeah. The recipient hasn't heard anything yet.

Q. Okay. Why don't we keep going.

(Audio recording played)

THE COURT: Stop.

MR. CLOHERTY: Stop.

Q. Okay. Again, these are my questions. Sir, are you reading from notes right now?

A. Well, I mean, yeah. Am I not supposed to or --

Q. I guess I'd ask you to --

A. Okay. That's fine.

Q. -- answer to the best of your recollection.

A. Yeah.

Q. If there are specific notes, we can identify and mark them.

THE COURT: Let me --

THE WITNESS: I didn't know. I'm sorry.

THE COURT: No, no. I'm just going to explain the

rule, okay? The rule is you should testify from your memory.

THE WITNESS: Okay.

THE COURT: But if you feel you need to refresh your recollection, you can say to the lawyer, I need to consult my notes.

THE WITNESS: Okay.

THE COURT: You can consult your notes, and then you need to still testify based on what you remember. You don't just read the note.

THE WITNESS: Right.

THE COURT: You ask, Is my recollection -- you ask yourself, Okay, now I remember. If your recollection is refreshed by looking at your notes, you can give a more fulsome answer. All right?

THE WITNESS: I apologize. It's my first time.

THE COURT: No, no.

MR. CLOHERTY: I just, I apologize for --

THE WITNESS: Yeah, it's my first time. I'm a little nervous. That's all.

Q. I want to get the best of your recollection --

A. Right.

Q. -- and the best of your understanding of how this works.

THE COURT: Just one quick thing. Here's the important thing: One person at a time. I can actually physically see the reporter react when people talk over each

other, so try to wait till -- you're a little quick with your answers. Let him finish. He's good about asking one question at a time. Let him finish it and then answer.

THE WITNESS: Okay. Thank you.

THE COURT: Go ahead.

Q. It might be a little bit my fault, jumping back --

A. All right.

Q. -- but we'll do the best -- we'll try to slow down.

Okay. So, I think we just heard, "Hello, this is a prepaid debit call from" blank, and, again, your testimony, your understanding is that that's heard by the recipient but not by --

A. That's correct.

Q. -- the inmate; is that right?

A. That's correct.

MR. CLOHERTY: Okay. And why don't you play the next sequence.

(Audio recording played)

Q. Okay. So, that's the next phrase.

A. Mm-hmm.

Q. Who hears that?

A. What's that, sir? I'm sorry. I didn't hear you.

Q. Who hears that? Who of the -- does the caller hear that message?

A. The called party hears that message, yes, sir.

Q. Okay. And does the receiving party hear that message?
A. Yes, sir.
Q. Okay.
A. I call it the "called party."
THE COURT: I heard you say "called party --"
THE WITNESS: Yes.
THE COURT: -- which is also the recipient party.
THE WITNESS: Recipient.
THE COURT: Why don't we say "inmate" and "recipient."
THE WITNESS: Okay.
THE COURT: That way we're not creating confusion.
Q. Yeah. That was probably my fault. I thought I heard you say the "calling party," not the "called party," but okay.
So, it's only the recipient that hears that, "This is a call from an inmate at the New Hampshire Department of Corrections"?
A. That's correct, sir.
Q. Okay. And that makes some sense, because they are the person who doesn't know who's calling them, and they're getting that information, right?
A. That's correct.
MR. CLOHERTY: Okay. Let's play the next message.
(Audio recording played)
Q. Okay. I think it's cut off in this particular example, but it's fair to say that at this point it says, "To accept

this call press zero," and, "To reject this call" -- there's other options; is that right?

A. Correct, sir.

Q. And who hears that prompt?

A. The recipient.

Q. The recipient?

A. The recipient.

Q. And does the inmate hear that message?

A. The "press zero" one, no, he does not.

Q. So, at this time all the sound is only being directed towards the recipient; is that right?

A. The recipient. Correct, sir.

Q. And then, assuming the person presses zero, the call continues.

MR. CLOHERTY: Why don't you play this.

(Audio recording played)

MR. CLOHERTY: Okay. Let's stop there.

Q. So, who hears that?

A. Both the parties hear that.

Q. Both parties. So, at that point the message -- the audio to the inmate is turned on, and he hears that?

A. That's correct, sir.

Q. And what controls that audio?

A. The system does.

Q. The software --

A. Yes.
Q. -- is that right? Okay. I think there's only one little piece left, so we might as well complete it.
(Audio recording played)
Q. Okay. And that's the last auto message in the call; is that right?
A. That's correct.
Q. And who hears that message?
A. When it connected?
THE COURT: That last bit.
Q. That last bit.
A. That last little bit? I can't be 100 percent sure on that. I wasn't paying attention.
Q. Okay. Okay. Now, we talked about sort of how the system works in active time as a caller calls or an inmate calls the recipient.
A. Mm-hmm.
Q. I have some questions about a recording. How does the system -- one of the things -- let me strike my preface and try again. One of the things that you also do as part of your role at Global Tel Link or ViaPath --
A. Yes, sir.
Q. -- is you also facilitate the recording of telephone calls from facilities, right?
A. Could you define "facilitate" a little more?

Q. Oh, well, you're aware that this system, at least in some instances, records these calls, right?
A. Yes, sir.
Q. In other words, it not only helps people place them; there's part of this system at least records some of these calls. Isn't that right?
A. Yes, sir.
Q. Okay. And how does the system do that? What is the mechanism that creates the recordings?
A. A mechanism -- okay. Well, we compress it, because a lot of times we have to save vast amounts of audio, so we compress it with our own codec, and then we simply -- it automatically gets associated with that call and that PIN, and it's all done electronically.
THE COURT: I think he's asking a more specific question, which, if I'm understanding it, you're asking about the action that causes a recording to be made or not to be made, is that a software instruction that says, Record this from the recipient, Record this from the inmate, Record this from both? How does that -- do you understand what -- I think -- isn't that what you're trying to get at?
MR. CLOHERTY: Yeah. You're anticipating my next question, yes, but that's fair.
THE COURT: Okay. Go right ahead.
Q. In other words, is that something that happens

automatically, or is that something that, you know, there's someone that has to hit a switch, or how does it happen?
A. That's all automatic.
Q. That's all automatic?
A. That's all automatic.
Q. And you said that -- I think you said a codec, a codec system?
A. Yeah.
Q. And we're going to start walking into technology that I am not going to understand, but how does the system know whether this is going to be a call that's recorded or a call that's not going to be recorded?
A. We would have had checked that when the number's requested to be made private, so that is a human interaction right there. We check a box that says, Private, Yes or No. It's just a little checkbox.
Q. Okay. So, I want to make sure I understand your answer.
A. Mm-hmm.
Q. And we'll talk about the policy, but I think you talked generally on direct about a policy by which an inmate may provide numbers that would be designated as private, right --
A. Yes.
Q. -- and therefore would not be recorded, right?
A. That's correct.
Q. But then as part of that -- once that request is made, you

said there's a human who then takes that information and I think you said "check a box." I'm guessing it's probably not a paper box, but it's a box on a computer; is that right?
A. It is, sir.
Q. Okay. And they would make that essentially data entry onto the software that runs this system; is that right?
A. That's correct.
Q. And that, if I'm understanding it correctly, that checkbox serves as the instruction for the software to not record.
A. That's correct.
Q. Okay. And it would not record calls from those numbers that have been entered into the system --
A. That's correct.
Q. -- that way. Okay. And let me show you --
MR. CLOHERTY: Your Honor, I don't know if I can approach, but I want to show him previously admitted Exhibit B.
THE COURT: You can approach.
MR. CLOHERTY: I actually think there's two copies of this, but one I know is -- what's been previously marked as Defense Exhibit B.
Q. Do you recognize that document? And take your time. I recognize it's in small print. Let me make sure I have it as well.
A. I've never seen this document before.
Q. You've never seen that document?

A. No.
Q. Okay. Well, let me just ask you a couple of questions about it, and it doesn't sound like you have much expertise. Fair to say one of your job responsibilities at ViaPath is to make sure that --
THE COURT: What number did you say?
MR. CLOHERTY: It's Defense Exhibit B. I think there's also a government -- it might be Government 5. Am I right?
THE COURT: I don't have it.
MR. CLOHERTY: Oh, I apologize. I have an extra copy here.
THE COURT: If you do, I'd just like to --
MR. CLOHERTY: Yeah, absolutely. Of course, your Honor.
THE COURT: Thank you. Go ahead.
Q. Okay. So, going back to your job responsibilities, I want to understand. One of your responsibilities is to ensure that the service that ViaPath or GTL provides is consistent with your contract with the Department of Corrections, right?
A. Yes, sir.
Q. And one of the things the Department of Corrections asks you to do is to help the Department of Corrections comply with their policies about when calls can or cannot be recorded, right?

A. Yes, sir.
Q. Okay. And so, but what I've shown you, which has been marked as Defense Exhibit B, is what's called a Policy and Procedure Directive, or the shorthand is PPD, I guess, in New Hampshire, 7.28 relating to access to telephones and phones in the New Hampshire Department of Corrections. So, are you not familiar with this policy, or just my description? Does that refresh your recollection at all about this policy?
A. I've never seen this policy before. I've never seen this piece of paper.
Q. Okay, okay. So, I'll ask you a couple of questions. Maybe you don't know. Do you understand that the New Hampshire Department of Corrections has a policy, and I'll just -- I'm reading from page 2, and I recognize you haven't seen this before, sir, and it's under letter H, if the Court wants to know where I'm reading from --
A. Okay.
Q. -- that, All telephone calls are recorded and may be accessed only by members of the Investigations Bureau. Do you see that?
A. Yes, I do.
Q. And I think you said or you testified that the recordings that are made of calls are recorded on the ViaPath system; is that right?
A. Correct.

Q. And are you aware that only members of the Investigations Bureau at the Department of Corrections are allowed to access those recordings?
A. The DOC sets up user roles within the system. Certain users are allowed to access certain parts of the system. Investigators, obviously, would be able to access recordings. I believe there's other staff members can, too.
Q. You think other staff members can, too?
A. Yeah. Mm-hmm.
Q. Okay. When you get a request for a recording, how does that come to GTL or to ViaPath from Department of Corrections?
A. They would look them up themselves. The Department of Corrections won't come -- maybe, unless it's a new user who is not familiar with the system, Hey, can you show me how to run a report and listen to a call, we might get those, but for the most part if Investigations or anybody wants to listen to a call, they just open up the software and look.
Q. Okay. I think that's helpful. So, in other words, you provide the software, you might provide instructions about how to use them, but you don't control who has access to them and who doesn't; is that right?
A. That's correct. Yeah. I mean, I'll get a request saying, Hey, we have a new employee, we need a user account, he needs to be able to see the phones or see tablets, and I'll -- I'd create that account for him, but that's about where my

interaction stops.
Q. Okay. And I think you said you might do training for the --
A. Sure.
Q. -- new employee on the software?
A. Yes, if requested.
Q. Okay. Further in this policy is a description of what's a Department of Corrections policy that reads as follows: "Calls to or from a PUDC legal counsel of record as confirmed by the process described below are not recorded." Do you see that? I know it's small print.
A. What letter is it next to?
Q. Section H.
A. Oh, H?
Q. Yeah.
A. All right. Okay. Calls to or from --
THE COURT: Counsel, could you just explain what PUDC is for him? Because I know.
MR. CLOHERTY: Now you're putting me -- it's Persons Under Departmental Control, I believe, although I'm not a --
THE COURT: An inmate.
MR. CLOHERTY: Inmate. That's right. I'm sorry about that, your Honor. It's a term, a New Hampshire term that I'm less familiar with.
THE COURT: Yeah.

Q. But the point here is that you understand that there's a policy that describes at least a process by which calls to or from legal counsel of record would not be recorded, right?
A. There were calls to legal counsel --
Q. Fair to say -- my question may have been bungled, but at least you understand that the New Hampshire Department of Corrections has this policy that allows for a mechanism by which calls from an inmate to attorneys of record are not recorded, right?
A. Correct, sir.
Q. Okay. And you facilitate or you take steps to help with that policy, right?
A. I didn't write the policy, nor did ViaPath.
Q. I'm not saying you haven't read the policy before, but you are at least generally familiar --
A. Yes.
Q. -- with the process that has grown out of this policy, right?
A. I am, sir.
Q. I think you already testified a little bit about, on direct, about getting attorney numbers and somehow the person, someone at ViaPath checking a box to make sure that call isn't recorded. Right?
A. That's correct, sir.
Q. Okay. And can you explain to me how you get those

requests?
A. Okay. Well, it will either come by paper or electronically.
Q. Okay.
A. Then my -- one of my direct reports would then simply Google the number. Say, it was me, and I was asking you, Hey, I want this number to be private to my attorney, so you would then -- then you would just Google it and then forward that request off to Investigations.
Q. Okay. So, you said the request gets made, and I think you said one of your employees -- I just want to make sure. So, it's a ViaPath --
A. A ViaPath employee, yeah. Sorry.
Q. Okay. Where is this ViaPath employee, by the way? Are they in New Hampshire?
A. Yes. We have one -- we have Mr. Stone at men's prison. We also have Mr. Jenkins at Northern, Berlin.
Q. So, it would go to one of those two individuals?
A. Mostly to Larry, if it's local.
Q. Okay. And they would Google the number; is that right?
A. Yeah. He would just do it as a courtesy. Then he'd just Google the number, see if it comes up to an attorney's, you know, website, and then it would include that link for the Investigations to look at.
Q. Okay. And do they maintain lists of attorneys?

A. No, my staff does not.

MR. CLOHERTY: Okay. I'm going to ask -- your Honor, can I approach again?

THE COURT: Yes. While you're doing that, just, I think the PPD numbering system may have changed at some point. Just for the record, the same thing as 7.28 is sometimes referred to as 677. That can matter for -- like, our library, we access them using different numbering systems, but what you call 7.28 is also -- listed as 7.28 is also listed as 677.

Q. I want to show you what has been previously marked as Government Exhibit 4, and I'd ask you to turn a couple of pages in.

A. Okay.

Q. There's some legalese in the first few pages.

A. Okay.

Q. And then there's a series of documents that refer to inmate requests, right?

A. Mm-hmm.

Q. Generally, you don't have to -- what are those?

A. Those could be anything. It could be a request to add a number that's not an attorney. It could be to report maybe a movie or something, an entertainment section is not playing properly. Just, basically, any problem with any of the ViaPath services could be reported either -- through the inmate request system.

Q. Okay. Are the inmate requests also one of the means by which an inmate would request that an attorney be placed on the private list, for lack of a better term?

A. Correct, sir.

Q. Okay. And so, they would give you that number or give it to one of these two gentlemen that you just referenced?

A. Mm-hmm.

Q. And they would Google it?

A. Yes, sir.

Q. And then would add it to the private -- or check the box that would make the call not be recorded; is that right?

A. Well, no. We send it off to Investigations to have that verified before. We, ViaPath, we don't verify anything. We do it as a courteous (ph), and, Hey, we'll Google this for you, just to help you out a little bit, but we don't verify anything.

THE COURT: I'm now a little confused. So, you do Google your -- your employees Google --

THE WITNESS: Yes.

THE COURT: -- but that isn't the so-called investigation that's being referred to?

THE WITNESS: No.

THE COURT: Suppose you get a request, you Google it, there's an attorney number that appears.

THE WITNESS: Mm-hmm.

THE COURT: What is the next thing you do?

THE WITNESS: We send that request off to Investigations to verify.

THE COURT: Okay.

Q. Okay. Are there ever instances where the process stops at the Google level, in other words, you don't even think this is worth sending to Investigations?

A. No, not if -- if it's to be marked "Private" it always goes to Investigations.

Q. This may be hard, and it might be easier if I approach at this point.

THE COURT: Feel free to do it any time. As long as you're not blocking someone's view or threatening or bullying the witness, you can move around as you choose.

MR. CLOHERTY: I'll try not to do that, sir. I hope I'm not threatening or bullying you.

THE WITNESS: All right.

Q. I'm just going to turn to a request that's dated November 24th of 2020. I apologize.

A. No. That's all right. All the pages look alike. I'll look for it, too. You said November 24?

Q. Yeah. Here it is, second-to-last page. And I'm just directing your attention to that page on this collection of inmate requests. And just for the record, this is a collection of inmate requests, and it starts with the name Charles Glenn,

right?
A. Mm-hmm.
Q. And this is a collection of requests involving Mr. Glenn. And this is a request that appears to be dated November 24th of 2020, and it says, and there's -- and this was done electronically; is that fair to say?
A. Well, yeah, this is a printout.
Q. Sure. There is a printout of the electronic, and at least the request from Mr. Glenn, if I'm reading it right, says: "Can you place David White and Kaytlye Bryant's number on my call list. There Seton Hall Law. And then there's a phone number. I have tryed for a couple weeks now to no avail. Thank you." Do you see that?
A. I see that, yes.
Q. And then there's a response that's dated the next day, and the author of the response is listed as Ahosie (ph)?
A. Ahosle, yes.
Q. Ahosle, okay. A-h-o-s-i-e (ph). And is he one of or she one of the employees that you referenced before?
A. Yes, yes. I didn't reference her before. She is no longer with the company.
Q. Okay. But at least back then --
A. She was.
Q. And was working for ViaPath or then Global Tel Link, right --

A. Yes, sir.
Q. -- and received this request? Now, she responds and says, "I have a list of approved attorneys and this number is not on the list. I cannot add it."
So, I just want to ask you again whether Viacom -- sorry -- ViaPath or Global Tel Link, based on this, maintained or kept any list of approved attorneys.
A. We don't.
Q. In 2020 was there a list of approved attorneys that you conferred with in response to requests?
A. No, there wasn't, and I should -- let's see. Oh, yeah. No, not in 2020 for sure.
Q. Okay. Do you have any explanation why Ms. Ahosie (ph) would respond by saying to Mr. Glenn, I have a list of approved attorneys, and this number is not on the list?
A. I do not know why she would say that.
Q. Okay. Mr. Slavin, I think we've talked enough about this process; at least you've described the process by which the folks at GTL would click something to make it private. You would agree with me that throughout this process there's a potential for mistakes to occur; isn't that right?
A. I don't think so, no. I wouldn't agree with that.
Q. Well, do you think there's no chance of human error in deciding whether or not to click that box?
A. I mean, we send off the request to Investigations, we get

it back with a yes or no. It says whether you clicked the box or not.
Q. And what if the ViaPath employee doesn't click the box?
A. Well, then -- yeah, I guess there could be, if it's --
Q. I'm not saying you have a policy intentionally --
A. Yeah, yeah, yeah.
Q. -- but part of the process is human, right?
A. Yeah, it is. Right.
Q. Part of the process --
A. Sure.
Q. -- any time a process involves humans, people can make mistakes, right?
A. There is, yes.
Q. And maybe this employee made a mistake saying that there was lists when, at least according to your testimony, there is no list, right?
A. That's correct.
Q. And in addition, there have been instances in Global Tel Link's history of technological mistakes, right, software glitches? Isn't that right?
A. I'm sure there is, probably, yeah.
Q. Well, in fact, Global Tel Link has made a number of mistakes before involving -- specifically involving the recordings of attorney-client calls; isn't that right?
A. Not that I'm aware of. I'm not an attorney, nor do I

follow that kind of stuff. I just kind of stay in my own corner here in the Northeast and work on that, but I'm not aware of -- since I've been employed no one has accused anyone in the Northeast of -- or has mentioned that we've made a mistake on that --
Q. Okay.
A. -- or recorded stuff that we shouldn't have been recording.
Q. You were employed in 2020, right?
A. Yes, sir.
Q. Are you aware of a press release done by the National Federal Defenders Office -- I don't know if you know what that is --
A. No.
Q. -- that stated, among other things, that Global Tel Link, another major prison telecommunications vendor, allegedly recorded phone calls with attorneys in Florida, California, and Maine?
A. Okay.
Q. Did you not know that?
A. No.
Q. And that they issued that in December of 2021?
A. Yeah, but I've never even heard of that before.
Q. Okay. I mean, you'd agree with me that Maine probably qualifies as the Northeast, right?

A. No, it does, but I'm curious, because I just got Maine as an account a year and a half ago, so I'm not -- I mean, if you're talking about Maine DOC, I'm not too sure.
Q. Okay. But you haven't heard about that?
A. No.
Q. In fact, have you heard about a case in Orange County, California where GTL recorded thousands of attorney-client calls due to both human error and what they describe as a technical glitch? Have you heard about that?
A. No, sir. I don't really follow that kind of news, I've got to be honest with you.
Q. So, you never heard that GTL was the subject of a lawsuit that involved the Orange County Sheriff's Department, in response to which GTL wrote a letter explaining that a technical error had occurred that resulted in the inadvertent recording of over a thousand inmate telephone calls made over approximately a three-year period? You didn't hear anything about that?
A. No, sir. You know, my position at the company, that might not make it over to me.
Q. Do you know an individual or are you familiar with an individual by the name of George McNitt?
A. Yes.
Q. Who's George McNitt?
A. I don't know too much about George, but I know he was the

overall -- I believe he had a lot to do with the writing of the software that runs the phones.

Q. In fact, he is the Vice President of Technical Services for GTL now.

A. Yeah, I don't know.

Q. Right?

A. I'm not too sure of his title, sir. I just know the name.

Q. And, I take it, you're not aware of a declaration that he was ordered to file in the Superior Court in the State of California identifying both human error and technical errors that resulted in what initially was believed to just be 1,000 attorney-client calls but turned out to be over 4,000 attorney-client privileged calls?

A. Yeah, I wouldn't know about that. I apologize.

Q. And no one at GTL or ViaPath ever engaged in any kind of training for you or your staff about the software and the implementation of this process in order to designate attorney-client calls as private or privileged?

A. I mean, my supervisor when I was hired went over it with me.

Q. But in the context of any of those trainings did anyone talk about lawsuits in California?

A. No.

Q. No one talked to you about any issues that have arisen in Maine --

A. No.
Q. -- with the very software that we're talking about here today?
A. No, sir.
Q. And it's fair to say, I think you testified about this, that the software that was in place in 2020 is the same software that's in place now?
A. It is. We get software updates for stability and patches, but, yeah, it is the same software.
MR. CLOHERTY: Okay. I just have a couple more questions, your Honor. And this is a -- I have an additional exhibit that counsel has agreed to that I've marked as Exhibit E.
THE COURT: All right. You don't happen to have an extra copy, do you?
MR. CLOHERTY: I do. I do, your Honor. I have multiple extra copies, your Honor, so I'm happy to hand one to you, too. Just a couple of questions about this document.
Q. There you go.
A. Thank you.
Q. I'm handing you a copy of what's been marked as Exhibit E. I'm guessing you haven't seen this document before.
A. No, I haven't, sir.
Q. Okay. I just want you to turn -- I only have a couple of questions about this -- on the second page of this document,

the second highlighted portion, modestly highlighted, that says: I remember her telling me that the calls were recorded because of a mistake that my phone number was his wife's and his wife's was the attorney number. Do you see that?

A. I do see that.

Q. Did anyone ever talk to you about the possibility that a mistake happened with respect to this case and with respect to the recording of the call that's at issue in this case?

A. No. I wasn't aware.

MR. CLOHERTY: Your Honor, can I speak with Mr. Glenn for just a second to make sure I'm --

THE COURT: Yes.

(Pause)

Q. Mr. Slavin, just a couple of other questions. I put Government Exhibit 4 in front of you before. I'm sorry. It was Defense Exhibit B. Excuse me.

A. Okay.

Q. But I understand you haven't seen that before, but that -- another part of that policy relates to the production of the recordings you said that GTL keeps and maintains, right?

A. Yes, sir.

Q. Does GTL have any policy regarding whether a subpoena is required before it produces a copy of any recording that it's collected on its system?

A. If someone was to ask me for recordings that's not a DOC

staff member I would -- so if someone was to ask me for recordings, whether it be -- maybe a resident, inmate might say, Hey, can you send this to my attorney, or something like that, I would simply reply, Please have your attorney open a subpoena for me, and we'll get those out to you.

Q. Okay. But are there any circumstances where you would distribute that recording without a subpoena?

A. DOC staff can -- I mean, people have access to read it themselves, so, to listen to it themselves. There would be no reason for me to distribute it or for my staff to distribute it.

Q. So, in other words, again, just to clarify, I think you did testify about this before, that DOC staff, because of the software they have on their system, can just grab the recordings that are there; is that right?

A. They can listen to them, yeah, depending on --

Q. Okay. And I think you testified -- okay. I think -- excuse me again.

A. Yeah, yeah, yeah.

Q. Just one follow-up question. When you said that GTL staff has access to listen to them, do they also have the ability to download copies of those recordings locally?

A. ViaPath staff members do, yes.

Q. ViaPath staff members?

A. Yes, and certain staff members of the DOC do, depending on

their user rights.

Q. Okay. And who at the Department of Corrections has user rights to download copies of the recordings?

A. I don't know that off the top of my head, sir.

Q. And do you know whether any writing is required before any such recording is downloaded?

A. You mean a written request?

Q. Correct, a written request.

A. Not that I'm aware of, no.

MR. CLOHERTY: Okay. I have nothing further, your Honor.

THE COURT: All right. Thank you.

Any redirect?

MR. JOYCE: Your Honor, I just have two brief points of clarification for the record.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. JOYCE:

Q. One, we heard a recording that was played on cross-examination. That's Government Exhibit 1, just so the record's clear as to what we were listening to.

A. Thank you.

Q. And just one question, sir. You mentioned Investigations when they are verifying phone numbers?

A. Mm-hmm.

Q. Is Investigations a Department of Corrections' entity, or is it a ViaPath entity?

A. It's a DOC entity.

MR. JOYCE: Thank you, your Honor. That's all I have.

THE COURT: Thank you, sir. You can step down. You're done.

THE WITNESS: Oh, thank you, your Honor. Leave all the stuff up here?

THE COURT: You are free to go. You can just leave that there.

THE WITNESS: All right.

(Witness stepped down)

THE COURT: That's all your witnesses?

MR. JOYCE: It is, your Honor. Thank you.

THE COURT: So, Counsel, I told you that, if you wanted to, I would give you an opportunity overnight to think about whether you want to produce any additional information in light of what we've received. I have gotten some stuff now that we didn't have before. I understand where Mr. Glenn is coming from with the list based on the communication you produced in cross-examination. I also -- I would like your interpretation of this exhibit that you just talked about to make sure -- I think I understand it.

MR. CLOHERTY: Sure.

THE COURT: If you would just give me your

interpretation of what it shows. I'm assuming it's an email from Ms. Melone that, in part, recounts a conversation she had with a Lynmarie Cusack about how it happened that a particular call was recorded, and that Lynmarie Cusack allegedly told Ms. Melone that it was a result of a mistake, that the phone number for Mr. Glenn's wife was -- her, Melone's, cell phone number was understood by DOC to be a phone number for Mr. Glenn's wife, and that's why it was recorded? Is that what that is saying?

MR. CLOHERTY: It's a little unclear, frankly, about exactly what she is saying. What she does clearly state is it was a mistake and there was some transposition of the numbers.

THE COURT: Let me go through it clause by clause.

MR. CLOHERTY: Yeah, sure.

THE COURT: It purports to be an email from Robin Melone, correct?

MR. CLOHERTY: Correct. Just so there's a record, I think, I believe it's to the FBI. It was produced to us in connection with the investigation. It's her --

THE COURT: Right. And on the second page of it, partway down in one of the bullet points: I called the prison. Though I don't remember exactly what I said, I know they pulled the call and listened to it. I remember Lynmarie Cusack asking if there was anything privileged, and I said, No.

That's Robin Melone reporting of a conversation she

had with Lynmarie Cusack where she was asked if anything was privileged, and she said, and Robin Melone said, No. That's how I interpret that. Is that how I should interpret it?

MR. CLOHERTY: I think you've got it right so far, your Honor.

THE COURT: Okay. And then the next bullet point is: I remember her telling me that day or another day that he made calls immediately after to his family, telling them to get ahold of me and to keep me in the case.

That seems self-evident. It's clear to me what I think that means.

Then the next bullet point is: I remember her, her, which I understand to be Cusack, based on content --

MR. CLOHERTY: Yeah.

THE COURT: -- telling me, which I understand to be Robin Melone, that the calls were recorded because of a mistake, that my phone number, which I understand to be Ms. Melone's phone number, was his wife's, and his wife's was the attorney number.

So, it sounds like a transposition.

MR. CLOHERTY: And that's really --

THE COURT: That's what Lynmarie Cusack --

MR. CLOHERTY: That's what I asked questions about. I recognize this witness doesn't have a lot to add.

THE COURT: Right. If you want me to take something

from this, I just want to know what it is and make sure I'm taking from it what you think it can -- how it can reasonably be interpreted.

MR. CLOHERTY: So, the primary reason I'm presenting that document to you is because it's actually evidence of, and I recognize it may not be conclusive evidence, of a mistake --

THE COURT: Yeah.

MR. CLOHERTY: -- of a mistake that happened, a human mistake that appears to have happened somewhere in the process that resulted in an incorrect recording of a telephone number.

THE COURT: Okay, good. So, I understand that.

With the understanding that you can take overnight and think about it, and if you want to produce additional evidence you can make a request to supplement the record, I'll let you do that, but I also thought we could engage on some of the legal issues that bear on the motion, unless you have any additional evidence to present now. I'm not going to rule.

MR. CLOHERTY: Yes.

THE COURT: I just want to talk to you about the law for a while.

MR. CLOHERTY: I have one other agreed-upon exhibit that I'd like to submit to the Court. This is a single or two-page copy of a sealed exhibit of a transcript from another proceeding, so I guess I would that ask the Court --

THE COURT: Keep it under seal.

MR. CLOHERTY: -- keep it sealed. I think it ought to stay sealed.

THE COURT: It will remain sealed until further order of the Court.

MR. CLOHERTY: Okay. Thank you very much.

THE CLERK: That's Exhibit F?

MR. CLOHERTY: That's Exhibit F. I marked it as Exhibit F.

THE COURT: And if we are going to make any reference to it in the record, we'll seal that portion of the record as well. All right?

MR. CLOHERTY: Sure.

THE COURT: Let me just look at it, though, quickly.

MR. CLOHERTY: Yeah. And you may need -- well, I'll leave it up to you, your Honor. You may need guidance from me about why I think that ought to be sealed.

(Sealed proceedings)

IN OPEN COURT

THE COURT: Back on the record in open court.

Okay. Let's talk some law here. Here's the way I'd like to proceed. So, Mr. Glenn has several arguments. I would like to start with the basic issue of whether the call, whether Mr. Glenn is contending that the communication he had with Melone, Ms. Melone, on that date that is the subject of the indictment was a privileged communication. Is that your

contention that it was?

MR. CLOHERTY: It is, your Honor.

THE COURT: Okay.

MR. CLOHERTY: And I apologize for this, so I think -- I don't think there's a dispute about this. Earlier in the day, just to make sure the record's unambiguous here, I provided to the Clerk and counsel -- at our last hearing the Court had indicated that transcripts of the calls that we played would be helpful. We conferred. We have agreed-upon transcripts, and those were also submitted to the Court.

THE COURT: Those were the excerpted calls you played previously?

MR. CLOHERTY: Correct.

THE COURT: We now have transcripts of those?

MR. CLOHERTY: Correct.

THE COURT: You both have listened carefully, and it's your view that you're in agreement as to what the actual words were?

MR. CLOHERTY: Correct. I mean, to the extent there's some -- there's a few spots that are unintelligible, and they're indicated as such, but counsel have agreed on those transcripts. And so, while, obviously, the actual evidence is the recordings, the transcripts were provided for the Court, frankly.

THE COURT: Okay. All right. Good. Thank you. All

right.

So, let's start with the issue of -- the defense is contending that the communication was a privileged communication, so I take from that you mean not only that the recording of that communication is not admissible, but Ms. Melone should be barred from testifying as to the content of the communication because it was a privileged communication, the privilege was not hers to waive, and she should be barred from testifying about it.

MR. CLOHERTY: I think that's right, your Honor.

THE COURT: It follows from your contention --

MR. CLOHERTY: I agree.

THE COURT: -- if it was privileged she can't unilaterally waive the privilege, Mr. Glenn never waived the privilege, so it can't be used against him without violating a Sixth Amendment right to counsel if the communication was privileged. Right?

MR. CLOHERTY: In its simplest form you have just articulated the argument.

THE COURT: That's why I want to start with that argument.

MR. CLOHERTY: Yeah.

THE COURT: Then I want to fall back and ask how, if at all, is the recording of that communication inadmissible under Title III? Then I want to turn to how, if at all, it is

inadmissible under the Fourth Amendment.

I'll hear you as to the extent you have an independent due process claim. I don't particularly see -- your arguments, the universe of your arguments seem to me to be captured by Sixth Amendment, Fourth Amendment, Title III, but if you've got some unique argument I can't understand on due process that's different from those things, I'll hear you on that at that time. Okay.

MR. CLOHERTY: I appreciate that, your Honor. I'll say that certainly a Fifth Amendment argument has been raised. It is rooted in all the pieces of the other argument.

THE COURT: I don't think it can independently survive. If there was no Sixth Amendment violation, no Fourth Amendment violation, no Title III violation, I don't see an independent ground on which there could be a Fifth Amendment violation.

MR. CLOHERTY: So, I appreciate that, your Honor. It's raised, at least in part, and, as you may recall, looking at the case law, there's a prior case from Massachusetts where along the way the defendant failed to raise a Sixth Amendment violation, and then everything was gone, and so, in an abundance of caution, and we live in times where, you know, Constitutional arguments may be in flux --

THE COURT: You're not waiving anything or abandoning anything. I'm just saying I don't see any basis for an

independent claim under due process, but you've made it, you can argue it, but I want to deal with that last, because I think it's largely derivative of other claims.

MR. CLOHERTY: Yeah. I agree that the same arguments apply.

THE COURT: And the starting point, and the point that is potentially most powerful for Mr. Glenn, is a claim that the communication itself was privileged, and, if it was privileged, there's no way that it can be waived by her, unless Mr. Glenn waived it, which we can talk about, if necessary, the privilege would bar not only the use of the recording but testimony by Ms. Melone as to the content of the communication.

But the threshold issue that I want you to address -- I'm going to first ask the government, because -- so we talked about burdens of proof briefly. I don't want there to be any conclusion about this. If the government can't demonstrate to me that this communication was lawfully intercepted and used, I'm not going to let them use it, so the burden is on them, in my mind, to satisfy me that this communication can be used in some shape or form at the trial.

So, I'm going to start with the government and ask the government to begin by discussing what I think is your core privileged claim, which is this is not a privileged communication because it is a criminal threat, and a criminal threat communicated by a client to a lawyer is not protected by

the attorney-client privilege, and, because it is not protected by the privilege, there is no separate Sixth Amendment claim about either Ms. Melone testifying about it or about any use of a recording of the communication.

That's your contention, is it not?

MR. JOYCE: Yes.

THE COURT: Okay. So, that's the argument I want you to address first. I know there are additional arguments that become intertwined with other things, like was there a waiver of the Sixth Amendment right, was the presence of a third party in the form of interception, does it vitiate the privilege, was the communication for the purpose of obtaining legal advice, all those things. But the core argument is, Stop right here, Judge. That's all you need to do. This is a criminal threat, criminal threats are not protected by the privilege, therefore, this communication was not privileged. What do you want to say about that other than what I've just said?

MR. JOYCE: I think the Court has boiled it down quite nicely. The call is in evidence as Government Exhibit 1, the transcript is in evidence as Government Exhibit 2, and I think it's clear that there is no discussion whatsoever about legal advice; there's no discussion whatsoever about strategy. The most Ms. Melone says is that she's with another client --

THE COURT: There is an expression of frustration by Mr. Glenn about his attorney, I do see that in there, but I

don't see, like, Oh, help me with my strategy on my 2254 today. It never got to that point, because he's frustrated that she's not doing what he wants her to do, she's frustrated that he's calling her, and it doesn't get very far before she expresses her frustration and he utters what you say is the criminal threat.

MR. JOYCE: Correct. And I would suggest to the Court that those moments of frustration are not for the purpose of obtaining legal advice or in any way fall within a privilege. He's frustrated that she's with another client and that she communicated with his sister, and then there's an indication that she's going to withdraw, and that's when you have the threat that follows.

But I think the case law that we've cited in our submission on pages 2 and 3 make clear that this type of communication is not privileged, it is purely a threat, it falls outside the scope of the privilege, and the recording should be admissible, and Ms. Melone should be permitted to testify about it.

THE COURT: All right. Counsel, what's your response to that argument?

MR. CLOHERTY: Your Honor, I just vehemently disagree. Even in the context, which matters when we're evaluating whether attorney-client -- whether it's an attorney-client privileged communication, is that Mr. Glenn is incarcerated,

and Ms. Melone's his lawyer. He is reaching out to her. I think the only possible reason for him to be reaching out to her, and he's essentially said it in his affidavit, was to obtain legal advice.

You said it yourself, your Honor. Sure, he expresses some frustration at the beginning of the call about her availability. I would suggest that's privileged.

I don't think we can parse the communication, I don't think we can slice the bologna that thin, in other words, that certain clients -- or certain parts of a communication. And I have -- I'm not testifying here, but I'm not saying anything that you don't know. Lawyers meet with clients for hours on end, sometimes short meetings, sometimes long meetings. Those meetings cover many different things that are part of establishing the attorney-client relationship and involve --

THE COURT: You're representing Whitey Bulger --

MR. CLOHERTY: Yeah.

THE COURT: -- okay, in a case that he has pending against him, and Whitey calls you on the phone and says, Listen, don't worry about this, I'm going to have that witness against us -- against me killed, and I really want your advice about won't that take care of the case. Do you maintain that that communication is protected by the attorney-client privilege?

MR. CLOHERTY: I think it can be, yeah.

THE COURT: Wow. That's a really aggressive --

MR. CLOHERTY: Well, your Honor, I have to tell you that -- well, I'm sorry. I won't be telling you, and I'm not trying to be casual here, your Honor. We're dealing with a client that has some mental-health history. I think there's no dispute about that. Clients go through emotional roller coasters all the time, and there's a host of issues that can arise during communications where people can get angry, people can get upset, but the purpose -- and I do think the privilege matters, and I guess it would depend on -- with respect to the Bulger facts, you know, what the purpose of the call was, so maybe one might argue that Mr. Bulger's purpose in making that call is different, but here I think there's no doubt that Mr. Glenn was calling for the purpose of obtaining legal advice.

And I don't think, and I think it's, frankly, dangerous for courts to start slicing and dicing pieces of communication and make decisions that all of a sudden privilege doesn't attach here. I think that in this context, where Mr. Glenn is incarcerated, where he is represented by counsel, that he's clearly calling counsel -- and I would suggest that the obvious purpose of the call, at least -- they didn't get very far in the call -- but the obvious purpose of the call is about her availability and some frustration about whether, you know, they've met or need to meet and maybe some

miscommunication about her availability, I don't think we can then just take a little piece of this, carve it out and say, well, that little piece --

THE COURT: Well, do you say there's no crime-fraud exception to the attorney-client privilege?

MR. CLOHERTY: I'm, of course, not going to say that, your Honor.

THE COURT: Tell me a case where you think the exception would apply. Because it seems like your view is, like, if Whitey Bulger says, I've got an in with one of the members of the jury, Counsel, so all you need to do is say X and that juror is going to vote my way, that would not be -- that would be attorney-client privilege?

MR. CLOHERTY: Well, again, I think it depends on the context and the purpose of the call. I do think there are ethical obligations that might trigger, you know, the lawyer's decision regarding that privilege, but I think, from Mr. Glenn's perspective, from Mr. Glenn's perspective, his intent here was the purpose of seeking legal advice, and I don't think --

THE COURT: I think I agree with you to that extent, that the way I'm interpreting the call, and the government will tell me if it has a different interpretation, the communication by Mr. Glenn was intended to further his ability to get legal representation from Ms. Melone. He was expressing his

dissatisfaction with her failure to fulfill that role in the way he wanted her to fulfill that role, and I do think that was the purpose of the call. Where I'm less certain that you're right is, where the means chosen by the client is criminal to get the lawyer to do what the client wants, that is not protected by the privilege.

So, a client, even for the purpose of -- like suppose you want -- I'm using my dated references deliberately. People are no longer alive. But if you were trying to get F. Lee Bailey to represent you, and you said to him, Look, I need you as my lawyer, and if you don't act as my lawyer I'm going to have your child killed, do you think that would be an attorney-client privileged call?

MR. CLOHERTY: Well, first of all, probably not. It doesn't sound like he's their lawyer yet, so it is not an existing relationship.

THE COURT: F. Lee Bailey is not paying enough attention, and you say, I'm going to have your kid killed if you don't do what I want you to do. Do you think that's privileged?

MR. CLOHERTY: I think it certainly can be, your Honor, in the context of the representation. And clients get upset and clients communicate -- and I'm not saying that Mr. Glenn expressed his frustration in the most artful way, to say the least, but I still think it is a dangerous thing for

the Court to parse pieces of those communications in any way.

I don't have to underline for the Court, my client would like me to, but I'm sure the Court is well informed, the attorney-client privilege is no small thing, predates the *United States Constitution*, it is fundamental to the way the entire system operates, and I don't think the Court can do that, to take one, you know, a few lines from a communication, decide, okay, because that was expressed in a particular way, that suddenly is not privileged --

THE COURT: Right.

MR. CLOHERTY: -- when -- without looking at the context, and the context here, and I do think it matters. And, you know, Whitey Bulger is who he is or was.

THE COURT: I'm not trying to equate your client with Mr. Bulger or you with F. Lee Bailey.

MR. CLOHERTY: I appreciate both of those distinguishing facts. But putting that aside, there is no dispute, I think government counsel will agree, he had a long attorney-client relationship with Ms. Melone. In fact, it was a bumpy relationship. They worked together. Then there was -- I think this is in the record, so I don't think there's any dispute. She was terminated. About a month went by, she was back in the case. There was a decent level of volatility there beforehand, and to ignore that and to pluck out of those communications this one, again, very inept or inartful phrase I

think goes too far and is a dangerous thing with respect to the attorney-client privilege.

THE COURT: I also want to be clear about one thing, which is in this case there's a particularly delicate issue, which is the basis for the claim that the call is not privileged is that your client was engaging in criminal activity. I am not going to make any finding that would be binding on a question on which your client has the ultimate right to a jury trial on. So, in a suppression motion I do make a ruling, but that ruling is, of course, whatever it is, doesn't deprive the defendant of his right to a jury trial on the ultimate issue. So, if it is privileged unless it is a crime, if it's not a crime it remains privileged, and I have to make a finding with respect to admissibility and suppression, but that isn't binding on the ultimate issue. I'm not trying to prejudge that case.

MR. CLOHERTY: I appreciate that, your Honor, and, again, and I probably don't have to preach to you about how important this privilege is, and so I don't know --

THE COURT: I hear you, I understand the challenge, but I think the issue -- that issue has been well briefed. Unless either of you have something more to say on it, I'll move to the next subject.

MR. CLOHERTY: Fair enough.

THE COURT: Anything more from you?

MR. JOYCE: No, thank you.

THE COURT: Okay. Let's turn to Title III, and here I want to focus on the law enforcement exception. So, there are arguments that the government has made with respect to Title III, with respect to the Fourth Amendment, with respect to the Sixth Amendment that turn on the issue of consent, or waiver, or no legitimate expectation of privacy because of the warning, and the defendant -- the government's claim is that the defendant understood that the call would be intercepted. I lump those under the broad rubric of consent, or waiver, or limited expectation of privacy, but there is an entirely distinct argument under Title III that is, regardless of whether there was consent, waiver, or expectation of privacy, it simply is not subject to Title III because of the law enforcement exception. All right?

You know what I'm talking about; you make the argument. So, why don't you present your claim that this is covered by the law enforcement exception and therefore is not subject to Title III.

MR. JOYCE: Yes, your Honor. That's the Lewis case out of the First Circuit. This is a recording system that is set up by the prison pursuant to a policy, and it's monitored in the ordinary course of monitoring outgoing inmate calls. This is precisely the type of recording system that falls outside of Title III. The jail investigators recorded this

call pursuant to the policy. It's recorded because the attorney number was never registered. I don't think there's any dispute over that, that the 617 number was never properly registered.

THE COURT: Before we get into the meat of the facts, I do want to be sure we're all on the same page with respect to the statutory argument. Title III bars the interception of certain kinds of communications. "Interception" is defined in 18 U.S.C. Section 2510(4) to mean the oral or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device. Electronic, mechanical or other device means, and this is in subsection -- Section 5 -- means any device or apparatus which can be used to intercept a wire or oral communication other than; and Subsection (a) exempts from that the use of a communications facility, telephone, et cetera that is used by an investigative or law enforcement officer in the ordinary course of his duties. That's the law enforcement exception that the case you cite applies, and that's what you say exempts this from Title III.

MR. JOYCE: That's right.

THE COURT: Okay. And what else do you want to -- the cases, as I understand it, talk about is it a law enforcement officer function, and is it in the ordinary course of their duties function? If it is, then the actions of the law

enforcement officer are not unlawful under Title III. Right?

MR. JOYCE: Right.

THE COURT: Okay. Does the defendant dispute the government's contention that the DOC people involved here are law enforcement officers under that section?

MR. CLOHERTY: We don't dispute that they meet the criteria of law enforcement under controlling First Circuit law.

THE COURT: Yeah. I mean, I think it's pretty clear. The First Circuit case law says you look to state law. State law, the 622:38 makes corrections officers law enforcement officers, the PPD 5.85 makes clear that they have law enforcement authority, and I don't think that would have been a productive argument for the defendant to make. The real issue is about was it in the ordinary course of their duties, and that's where I think we should devote our attention to.

MR. CLOHERTY: Sure.

THE COURT: Okay. So, what do you want to say about that? And then I'll hear from the defense.

MR. JOYCE: Your Honor, this is pursuant to a documented policy that's in the record. The policy sets forth the manner in which the recording system operates. It did operate in that manner. It excludes certain calls for privileged purposes.

THE COURT: If your witnesses are to be believed, and

Mr. Glenn is not to be believed, then you're right, but his position is quite different. His position is, This was a call with my attorney. I understood, based on my experience in using this system, that if I didn't get a warning, that my call would be treated as a privileged communication. I did not get a warning, therefore, based on my prior experience and practice and the fact that I didn't get a warning, this is not the way the system would operate in the ordinary course of business to make that recording, in the ordinary course of a law enforcement business. This call should not have been recorded, because they didn't give me a warning. What do you say to that?

MR. JOYCE: A couple of things in response, your Honor. First, my recollection of Mr. Glenn's testimony is he acknowledged that he never recorded the 617 number, that this was recorded over --

THE COURT: Yeah. I wouldn't use the term "recorded," but I do think Mr. Glenn, he was quite frank, and he didn't try to hedge or evade or anything else. He said very clearly, I think it might have been in response to a question of mine, No, I never designated that particular phone number of Ms. Melone's to be a privileged communication. That's not his theory.

His theory is there are lists of protected -- of lawyers. I reasonably believe that that list of protected lawyers was not just a list that was checked to investigate

whether to allow it to be unrecorded, but it was actually in the way the system operated, and that I would have understood Ms. Melone would have been on that list, and then I would have understood that it should not have been recorded, and I took from the fact that there was no warning, I was comfortable in my conclusion, and, to the extent it's relevant, my interpretation is entirely buttressed by my own lawyer, who told me that communications with us were protected.

I'm trying to make your case for you, using all of your evidence and arguments. That's what I understand Mr. Glenn's position is.

So, if those are the facts, would that still be in the ordinary course of law enforcement duty?

MR. JOYCE: Well, I do take some exception with those --

THE COURT: Yeah.

MR. JOYCE: -- as the facts.

THE COURT: You're not conceding that.

MR. JOYCE: No.

THE COURT: Your position -- to state your position for you, your position is very clear. There's a system. The only way a call could get recorded -- not recorded in the circumstances of this case would be is if Mr. Glenn used his tablet, as he knew how to do, to designate a call as privileged, and that would trigger an investigation and a

confirmation that the call would be added as privileged, and he admits he didn't do that, therefore he had no ability to -- no right to expect that the call would be anything other than recorded; and, importantly, from the perspective of the Title III argument and the law enforcement exception, this is the way the system was designed to function, and this is the ordinary way it functions; this call would be recorded, there would be a warning. He did get a warning, it's on the recording, and it would be -- because it's on the recording in the way the system operates, he and Ms. Melone would have received it. That's the way the system works. That's your position, right, factually?

MR. JOYCE: Right.

THE COURT: He's got a very different set of facts. If his set of facts are right, do you still have an argument that it was -- the law enforcement exception applies?

MR. JOYCE: If his set of facts are right that somehow the recording did not operate as it -- the system did not operate as it should have, it is still a -- it's still a system that is designed and implemented pursuant to a policy in the normal course of the jail's functions.

THE COURT: Let's assume even there's a glitch or something else. Your position is there's no evidence that someone was flicking the switch on and off --

MR. JOYCE: Correct.

THE COURT: -- to try to trick him into getting a

recording, and, if it happened, it would have happened inadvertently, even under his -- and the key fact is you didn't do what would be necessary for us to not record, and our default is we record.

MR. JOYCE: Right.

THE COURT: And that is what would have happened in the ordinary course of business. So, you would say, even if his testimony is correct, it still is in the ordinary course of business?

MR. JOYCE: Yes. And when the Court considers his testimony, I think it's important to note, my recollection, and I haven't reviewed a transcript before today, is he acknowledged that he receives those warnings when he calls --

THE COURT: Yes.

MR. JOYCE: -- a friend or family member. And there's no evidence that there's a third path. There's either attorneys that are registered the proper way, by the inmate making that request, which he acknowledges here he didn't do, or there is the warnings that are associated with the call to any other nonregistered number. There's not a third path where somehow Ms. Melone's number was entered into the system by some other manner for which he didn't receive a warning, and the warnings are clearly audible on the tape.

THE COURT: So, defense counsel I'm sure will argue Mr. Glenn's view of the facts and make their argument -- his

argument based on that view of the facts, but I anticipate that defense counsel might say something in addition to this, and that is, even if -- We think Title III was violated by the making of the recording, but I think defense counsel is likely to say, Even if you don't agree with us on that, Judge, Title III also restricts what can be done with a recording once it's made, and this would be an unlawful use of the Title III recording, to produce it to the victim within two days of the interaction, two or three days of the interaction, and that violation of Title III has to have a consequence, and the consequence should be suppression. Am I making something up?

MR. CLOHERTY: No. You're picking up on it, your Honor.

THE COURT: All right.

MR. CLOHERTY: I have more than that, but that's part of it.

THE COURT: I expect he's going to make that argument. What do you say to it?

MR. JOYCE: Well, I don't think that was briefed.

THE COURT: It wasn't briefed.

MR. JOYCE: I understand --

THE COURT: I did read Title III --

MR. JOYCE: Yes.

THE COURT: -- and think about it, and I know there are restrictions in Title III, defense counsel can probably

draw them to your attention --

MR. JOYCE: Sure.

THE COURT: -- that restrict not only the recording but also the use.

MR. JOYCE: And that is a recording that is made pursuant to Title III, a court-authorized wiretap.

THE COURT: If it's not subject to Title III because it's law enforcement exception, none of Title III applies.

MR. JOYCE: I think that's right.

THE COURT: Okay.

MR. JOYCE: I don't dispute that, if it's a Title III interception made pursuant to a court-authorized order, that there are restrictions and limitations and statutory requirements for disclosure. I'm not aware that those Title III requirements somehow get transferred to a system that is outside the scope of Title III when the recording is made.

THE COURT: All right. I hear you. So, it wasn't briefed, you don't have any cases for me, but that's what you would say.

MR. JOYCE: Yes, your Honor.

THE COURT: Okay. Anything else you want to say on that issue?

MR. JOYCE: Not unless the Court has any additional questions. Thank you.

THE COURT: All right. Let me hear what defense

counsel has to say.

So, I tried to anticipate your arguments to hear his response, and you can then do what you want to.

MR. CLOHERTY: That was a pretty good job, your Honor, at least in part, so why don't I start where you left off.

THE COURT: Okay.

MR. CLOHERTY: I think the government is construing the term, you know, the ordinary course of their duties too narrowly, because I think here they're relying on, in no small part, on the PPD policy, which is Defense Exhibit B, and I think it's also a government exhibit, and before we even get to the recording, and you're well aware of our battle about the recording, that policy has a number of strict requirements that were not followed at all, that they may only be -- well, we don't know, but it says they may only be accessed by members of the Investigation Bureau. We heard some testimony today that struck me as inconsistent with that, but be that as it may.

But, in particular, any requests -- this is in the policy -- any requests by staff members or outside law enforcement agencies for recorded phone calls must be submitted in writing to the Investigations Bureau and will need approval by an Investigator III, designee or higher authority. I think the government will agree there is no written request, there's been no subpoena, there was no warrant. And the warrant, and I know that bleeds into the Fourth Amendment issue to some

degree, not a complicated process for them, for them to, you know, if they think they have probable cause, to go get a warrant.

THE COURT: You work primarily in Massachusetts. I sit in New Hampshire. I've got to tell you I've probably heard 30 cases involving prison phone calls, none of which are done pursuant to a warrant. I mean, that just doesn't happen.

MR. CLOHERTY: Well, let me ask you this. First of all, it's certainly -- I'm just pointing -- it should certainly at least happen pursuant to a written request, which is what the policy requires, and it is certainly out of the ordinary to hand it over to the complaining witness.

THE COURT: Well, let's assume there's a violation of the PPD. The *Constitution* doesn't mandate suppression for violation of a PPD.

MR. CLOHERTY: Well, we're talking about --

THE DEFENDANT: (Inaudible) argue.

MR. CLOHERTY: We're going to get there. We certainly think it does, but we're talking about Title III right now, and I believe that, to the extent the government wants to rely on that PPD to establish that the law enforcement officers here were acting, again in the words of the statute, in the ordinary course of their duties, they can't just blow off their requirements.

THE COURT: I think that is fair. To the extent that

their ordinary duties require things, then you have to consider a failure to follow those as to whether under Title III they are nevertheless acting in accordance with their ordinary responsibilities.

MR. CLOHERTY: Right. And so, that's really, at least here, as we're addressing that statutory argument --

THE COURT: That's fair.

MR. CLOHERTY: -- so before we even get to the many inconsistencies and our position about the actual recording ourselves, we think, or I think that the government's constriction of what constitutes "ordinary course of their duties" under Title III is too narrow, and that it includes not just the recording itself but the collection and distribution of that recording under that policy.

THE COURT: What do you make of the government's argument that if this is not -- well, I'll let you get to it, because you want to separately make your argument about, even if it was under the law enforcement exception intercepting, it still was not in the ordinary course of the duty to distribute it.

MR. CLOHERTY: Well, so that's essentially what I'm saying.

THE COURT: What you're saying is an argument that, to the extent that is your argument, the government's response is, If we intercept it lawfully, and it comes within the exception,

it's not subject to Title III at all, and therefore we can do with it what -- we could put it on the Manchester *Union Leader*, if we wanted to.

MR. CLOHERTY: Well, again, I disagree with that. I think that construes the exception, that construes the exception too narrowly; rather, that the exception applies if the officers were acting in the ordinary course of their duties. They want to narrow that to the interception itself, as opposed to the policy that they're relying on, which includes not just the interception but also the distribution. So, that's where we disagree.

THE COURT: Okay.

MR. CLOHERTY: You know, I don't think, I don't think they can just take this little, one part of the policy and say this was ordinary.

Now, let me get to the second part, which maybe I don't need to belabor, because I think the Court's -- what we have really focused on during a lot of the evidence is that this wasn't close to the ordinary course of the duties, as far as I can tell from the evidence. You have Mr. Glenn's testimony about what he heard or didn't hear during the course of the call that didn't comply with that policy. You heard at least inconsistent testimony or I guess I would say consistent testimony that somehow there isn't a list but then at least a document, relatively contemporaneous document, which suggests

there was a list that is not conclusive, perhaps, but somewhat consistent with Mr. Glenn's recollection.

THE COURT: Just walk me through the PPD, and let's just list everything in there that you think the policy requires that they didn't do. That might be a -- make sure that I look at everything you say is a problem.

MR. CLOHERTY: Sure. Yeah.

THE COURT: Let me just get the PPD out.

MR. CLOHERTY: Sure. And I probably have a copy, if you want it, your Honor.

THE COURT: Yeah, I've got one.

MR. CLOHERTY: Okay.

THE COURT: Okay. I've got 7.28 in front of me. Just draw my attention to each aspect of the PPD that you think was not complied with.

MR. CLOHERTY: Sure. Yeah. And I think it's really all in Subsection H, capital H, which is on the second page.

THE COURT: Yeah. Got it.

MR. CLOHERTY: You know, I guess I'll walk through this. The first, the very first sentence: All telephone calls are recorded and may be accessed only by members of the Investigations Bureau.

You heard testimony today from Mr. Slavin that that is not correct and there wasn't compliance with that. It remains unclear, frankly, on this record with respect to this

particular call who particularly accessed it, so I don't want to suggest that I have proof --

THE COURT: I don't know -- I can't say on the record that there is any evidence as to who did it. It is definitely clear, you've proven that her lawyer had gotten ahold of it, right?

MR. CLOHERTY: Yup.

THE COURT: So, somebody accessed it and gave it to her, her lawyer. We don't know who on the basis of this record.

MR. CLOHERTY: Right. Well, we did hear also testimony from Mr. Slavin today that more than the Investigations --

THE COURT: He did say there are other people. What I took from his testimony on that point is that essentially there are something akin to administrative privileges that can be granted under the software, so the company can grant it to anybody, but that he understood that people in the Investigations Bureau would have those access privileges, and unspecified others would.

MR. CLOHERTY: Yeah.

THE COURT: But I don't know who those unspecified others --

MR. CLOHERTY: I agree. And the particular point, because, obviously, we're not talking about general compliance,

we're talking about compliance with respect to this call, and this is an exception that the government wants to invoke, we don't know who accessed the call, because the government has not presented evidence of precisely who accessed the call and how they accessed it.

THE COURT: We just don't have -- we have an absence of information. We can infer that somebody accessed the call --

MR. CLOHERTY: No doubt.

THE COURT: -- but we can't infer that anyone accessed it who was not part of the Investigations Bureau, because we just don't know, but we do know that unspecified others, in general, can do it.

MR. CLOHERTY: Right. And I guess, coming back to the point, this is an exception that they have to prove and they have to establish, so I don't think they've established that they complied with that sentence.

THE COURT: All right.

MR. CLOHERTY: The second sentence: Any requests by other NHDOC staff members and/or outside law enforcement agencies for recorded phone calls must be submitted in writing to the Investigations Bureau and will need approval by the Investigator III/designee or higher authority.

THE COURT: You don't know whether that was complied with?

MR. CLOHERTY: Well, I can represent, and I don't think there's a dispute here, that there is -- no such writing has ever been produced in connection with this case. I don't believe it exists. I have to believe that if such a writing exists it would have been in discovery production number one, if not certainly produced in connection with this hearing, so I don't believe there's any writing consistent with the second sentence of that policy.

THE COURT: So, you would say at the very least the absence of a writing under these circumstances suggests that there was no writing, and, because there was no writing, the PPD wasn't complied with in that respect.

MR. CLOHERTY: Correct, correct.

THE COURT: Okay.

MR. CLOHERTY: And I do think, given the government's discovery obligations, I can't imagine that a writing is going to surface at this late date.

Let me just get to the next sentence. The next sentence doesn't really have a rule. It just says that a process is to be followed with respect to a legal counsel of record.

Then the next sentence says: When a PUDC, an inmate, sends their regular telephone request to the Department's telephone system vendor, presumably ViaPath, the vendor will make a note in the system of the relationship of the party they

want to add to their telephone call list. I don't really have comments about that. It's really when we get to the lawyer part. If it is noted that the person is the attorney of the PUDC, indicating an attorney-client relationship, the vendor company will verify the name of the attorney and determine that the attorney is in good standing with the NH Bar Association or similar organization, if from another state.

I heard the testimony somewhat different from this policy, whether it's material or not, that they don't do that, the vendor doesn't do that. They actually send it back to the investigator.

THE COURT: But they only do that under this policy when there is a request from the inmate to designate the person as an attorney.

MR. CLOHERTY: Correct. Correct.

THE COURT: So, if that never occurred, and your client acknowledges it never occurred --

MR. CLOHERTY: Correct.

THE COURT: -- that failure of compliance on your part really isn't a failure of compliance, because a precondition for compliance was never fulfilled.

MR. CLOHERTY: Well, yeah. I mean, the remainder of this policy sort of talks about the attorney's number being verified. It will then be noted in the system, et cetera.

THE COURT: You did establish that their practice,

when there is a request, is to do something, and arguably that didn't happen here.

MR. CLOHERTY: Correct.

THE COURT: But the obligation to do it under the policy arises when the inmate makes a request. Your client concedes there was no request made, therefore that part of the policy -- they were not required under their policy to follow that part.

MR. CLOHERTY: Well, okay. A couple of points I will say, first of all, is that I think -- I think you heard from Mr. Glenn -- first of all, this policy, which is not I think informed by regulation or law, it's unlike the Massachusetts' policy, which is -- but I also think it's not the only part of the story, that the practice I think you heard from Mr. Glenn in practice, and I think even from the Viacom -- or, I'm sorry -- ViaPath representative varies somewhat from this policy.

THE COURT: I think we have to draw a distinction between what the policy -- the way in which the policy was implemented by the Department of Corrections and what Mr. Glenn reasonably understood was happening, because, even if they complied fully with the policy, that Mr. Glenn still has arguments that, Because of the way things operated I had a reasonable expectation that this call would not be recorded and that it was privileged. That can bear on these consent/waiver

arguments.

MR. CLOHERTY: Yeah.

THE COURT: But it can be the case, I'm not saying that this is the case, but it could be the case that Mr. Glenn reasonably believed that his call was privileged, and yet the Department of Corrections followed its policies in not -- in recording that call, because the ordinary practices of the Department of Corrections to not record are triggered by a request from the inmate, and, since none was made, that the way the system operates, cranks through, software operates, no request made, must record, that's the practice, yet there could at the same time be a belief by Mr. Glenn, My call is privileged, I didn't hear a warning, I know that when I hear a warning that the call is being recorded, I know when I don't hear a warning that it's not being recorded, so I had an expectation that it would not be recorded. It's possible for those two things both to be true.

MR. CLOHERTY: It is true. I guess what I will say, again, the statutory language is "in the ordinary course of their duties," and I don't think the Court can divorce that phrase from the significant sort of Constitutional implications of this policy or sort of allow, allow the Department of Corrections to adopt the policy, which I have to say, and I recognize I'm an out-of-state lawyer saying it, it's deeply troubling to me that it puts the entire burden on the inmate to

do it and do it right, no sort of independent -- and, in fact, where it was admitted that there wasn't even training for the inmates about this, but that's a different issue.

But I do think in the ordinary course of their duties, that I think it's broader than just strict compliance. That would allow the Department to adopt a policy that's not enacted pursuant to any law or regulation, it's just an internal policy that tramples all over the Constitutional rights of a defendant.

THE COURT: One could construct a system that would work better. For example, in the old days, when you had to go to a pay phone there would be a sign right beside the pay phone that said: Any call you make from this pay phone is going to be recorded.

MR. CLOHERTY: Right. I think one of the cases talked about that. Yeah.

THE COURT: And when you go to a tablet system, a well-designed tablet system -- like, when I log onto my computer here the first thing I see is a warning from my government that says: Bear in mind we're monitoring everything you're doing on this computer. I get that every single time I log on.

There's nothing that could have prevented them from having a tablet when you want to dial a number that they get a warning that comes up on the screen and says, Unless you have

designated them as an attorney and the attorney has -- and you have received a communication from us saying that your number is an attorney number and you can call, your call will be recorded, and that would eliminate this problem, but they don't do that.

MR. CLOHERTY: Yeah.

THE COURT: All right.

MR. CLOHERTY: And I guess I will say, your Honor -- and, look, there are some practices that at least, like attempting to implement seems somewhat inconsistent to me -- but there's nothing in the regs that require that audio warning, as far as I can tell. They don't require it, but I think we would agree, maybe we wouldn't, that if they didn't have that, that would be problematic and I would argue would be violative of what this policy is at least attempting to achieve.

THE COURT: Well, it wouldn't be in violation of Title III for them to have no warning at all, as far as I see it. If their policy was clearly stated and people were informed that, Your call will be recorded unless you ask to have it designated and, after investigation, your request has been approved, at that point they could just record away; they don't need to put a warning on the recording.

MR. CLOHERTY: I'm not going to dispute your hypothetical, but -- I don't want to belabor this -- I think

you understand our argument, and among it is that the ordinary course of law enforcement duties is not so narrow as to stop at the moment of the recording. But, again, I think there's --

THE COURT: But you also -- is there not a section of Title III that restricts both the actual interception and the disclosure of intercepted communications to others? I think there's a section of Title III. Am I wrong?

MR. JOYCE: There's a whole section on disclosure, your Honor.

THE COURT: There is a section on disclosure that prohibits disclosures except as authorized in that section. You also are making an argument --

MR. CLOHERTY: Yes.

THE COURT: -- that even -- if this was an interception that is subject to Title III, even if their interception was not unlawful, their disclosure to Ms. Melone was unlawful, and that unlawfulness should bar the ability of the government to use the recording at trial.

MR. CLOHERTY: That's correct, your Honor, and it's fair to say that that was not fully briefed.

THE COURT: And that's not well developed in the brief --

MR. CLOHERTY: I agree with that, your Honor.

THE COURT: -- but it is there, and I'll try to consider it. I haven't focused on it, because it hasn't been

briefed, but I'll look into that before I rule.

MR. CLOHERTY: I know the Court has made comments about supplemental briefs, but if you'd like me to submit something in connection with that --

THE COURT: I don't think I need that. I'm able to evaluate it. I just need to look at that section carefully and ask what case law exists that addresses that question of, well, if the interception is lawful but it is otherwise subject to Title III, but the disclosure is unlawful, is suppression an appropriate remedy? I really don't know. I can figure that out.

MR. CLOHERTY: Okay. Well, I guess, formally I would like to advance that argument to the Court as well.

THE COURT: I hear you making it. I'm not going to foreclose you from considering it, because it wasn't briefed. If you really wanted to submit supplemental briefing you would be the one that would be entitled to it, and then they can reply, but I'm telling you I think I can figure that one out on my own, unless you want to.

MR. JOYCE: No, I don't feel I need to, your Honor. I would also point out that, at least for the disclosure under state law, that in the context of a pending state civil case a state court judge has also ruled on this issue.

THE COURT: On this particular issue?

MR. JOYCE: In this matter.

THE COURT: He or she has issued a written decision?

MR. JOYCE: There is, your Honor. I'd be happy to provide it.

THE COURT: I'm sorry. Yeah. Could you leave it with me? I'll look at it.

MR. JOYCE: Yes, your Honor.

THE COURT: It's not controlling.

MR. JOYCE: Of course.

THE COURT: It's a question of federal law. I have to make up my own mind, but I'll look at it. Okay. Anything more on that Title III law enforcement exception argument?

MR. JOYCE: No, sir.

THE COURT: Okay. Let's turn to the Fourth Amendment argument. I think the government's principal Fourth Amendment argument is that there is either a waiver/consent, or another way to conceptualize it is there is no legitimate expectation of privacy when there is a notice that the call will be -- is subject to recording.

But do you want to make any other arguments under Fourth Amendment? And, if so, make whatever argument you want to make as to why the Fourth Amendment hasn't been violated.

The obvious ones are, Judge, believe my evidence. My evidence leaves no doubt that he was warned. When there is a warning like that, the First Circuit has said that the parties have consented. I don't know that there's a First Circuit case

that does this, but other Circuits do, and I think it's probably even the better way to view it, is there's no protectable expectation of privacy under those circumstances, and therefore inmates have very limited expectations of privacy at all, and when they're told their communications are being recorded they don't have any protectable expectation of privacy. That's similar to what I think Judge Lynch's opinion talks about, where she talks about it in terms of consent.

But anything you want to say about that and any other arguments you want to present?

MR. JOYCE: Your Honor, I think the Court has recited our argument. It's set forth in our briefing. I don't have anything else I need to add at this time. Thank you.

THE COURT: What do you want to say about the Fourth Amendment issue? Your threshold argument is, Judge, believe my client. He didn't get the warning. If he didn't get the warning, he expected it would be privileged, and even when inmates -- even inmates who have limited expectation of privacy have an expectation that their privileged communications with their lawyers will be protected, and that is the kind of expectation of privacy that the Fourth Amendment should protect, even for inmates, and consent did not happen here, because my client did not get the warning; and on top of that, under the circumstances as he understood it to be, he had a reasonable expectation that his communication would not be

recorded, and that's all you need.

MR. CLOHERTY: And so, you did summarize a good chunk of it, your Honor, and obviously you heard Mr. Glenn's testimony on what he did and didn't hear. Didn't hear the warning, I think that would end the case. But even if he did, or even if there's some confusion, and I think there's no record -- there's no doubt that in the record there's a lot of confusion about precisely who hears what. There were spots -- there were at least a couple of spots in Mr. Slavin's testimony today where he wasn't sure who heard what. He did say that both parties heard that warning portion, but you can take his testimony for what it's worth. But even if he did, and one of the reasons I played those recordings, which I know were a little hard to hear and frustrating, but I do think the transcripts matter, if you weren't sure what do you do? You ask your lawyer, and that's precisely what Mr. Glenn did on multiple occasions about the very line.

In fact, the transcript, it's a short transcript, it's only -- which is marked as D4T -- it's D1T, D2T -- of the four calls, Mr. Glenn saying, This ain't a recorded line, right? His lawyer responds, No. This is an attorney line.

THE COURT: You did not produce the full transcript of the call to me.

MR. CLOHERTY: Did not.

THE COURT: Did you produce the initial --

MR. CLOHERTY: Yes.

THE COURT: -- back and forth?

MR. CLOHERTY: Yes.

THE COURT: And do they purport to contain the --

MR. CLOHERTY: They do indeed, your Honor. And so, what I will tell you -- I mean, again, Mr. Glenn testified he didn't hear it, but even if he did and there was some level of uncertainty -- and he asks his lawyer to confirm. He does it essentially four times. There's different natures of the exchange. On call number 3, the transcript where Mr. -- the subject matter, it appears to be some -- she tells him that she's speaking on her cell phone. He says, Okay. Is it confidential? She says, Yes, it's confidential. And then later in the call, where there apparently is talk about another phone, she says, I'm not talking on another phone, because this one is confidential. Any other phone is not.

And he asks her in another call, This phone is not recorded? She responds, It's an attorney call. So, if the question -- and I think it is the core question for the Fourth Amendment here, which, as the Court has already indicated, I think bleeds into all these other issues, including consent under Title III as well as --

THE COURT: Yeah. Well, there is a consent exception to Title III, there's a consent exception to the Sixth Amendment.

MR. CLOHERTY: Right. Yeah.

THE COURT: There's no expectation of privacy if you consent.

MR. CLOHERTY: Right.

THE COURT: So, all three of those are some version of call it consent, slash, waiver, slash expectation of privacy --

MR. CLOHERTY: Right, right.

THE COURT: -- can be made with respect to all three of those.

MR. CLOHERTY: Right. And so, we have multiple instances of -- and also there's testimony about this policy, which is a complicated policy, that little training is provided to inmates. I'm not saying Mr. Glenn didn't at least have a general understanding of how to do it, because there's obvious evidence where he put calls in, but even if there's confusion what does an inmate do? He asks his lawyer, and he did so on multiple occasions, and I would submit to you that that is the end of the story in terms of his expectation of privacy, that he had a reasonable expectation of privacy. Because you can have all these policies out there, which, again, I think you've acknowledged Mr. Glenn is a smart, articulate guy, but he's entitled, I would submit, to accept the representation from his counsel that whatever may have been done about him putting in a number or not putting in a number, that's not an issue now because, My lawyer says this is an attorney line, it's not

being recorded, and that, I believe, creates -- is all that needs to happen for there to be a reasonable --

THE COURT: You do agree that your Title III and Fourth Amendment arguments bar the use of the recording but don't bar the witness's testimony?

MR. CLOHERTY: I agree that that's -- yes, they are targeting the recording of the call.

THE COURT: Right, as opposed to your Sixth Amendment argument, which reaches more broadly --

MR. CLOHERTY: The whole thing, correct.

THE COURT: -- and would keep the entire communication out.

MR. CLOHERTY: I think your Honor has it spot on, yeah. But that's the crux. We can talk about --

THE COURT: I hear your argument. I fully get why Mr. Glenn wanted me to hear about the list and hear that excerpt about Ms. Melone having heard from somebody that there was a mistake. Those are things that he wants me to hear, and I have heard them, to bolster his view of the evidence. Now, I'm not saying that I agree with that, but I do want you to know I've heard that --

MR. CLOHERTY: Yes.

THE COURT: -- and those things do bear on his credibility. They don't necessarily resolve the issue, but I hear them, I've heard them, I'll think about them, so you don't

need to say more on that, unless you want to.

MR. CLOHERTY: No, not on that. I appreciate that I think your Honor heard it the way we want to present it.

The only other thing I'll mention is, because the government proffered it, and I'm sure you'll look at it, the state court case which did address in part -- I'm not going to pretend -- ruled against him on reasonable expectation of privacy -- critical that they didn't have those four recordings. No evidence of those communications to Mr. Glenn was presented to the state court. I don't know everything, the scope of what happened, but I want to be crystal clear about that, and, frankly, I just think they're a game changer. Mr. Glenn wants me to point out one other --

THE COURT: Let me just stop for a second. My reporter is going to need a break.

MR. CLOHERTY: Oh, okay.

THE COURT: So, what I am going to do is we'll take a break, and we will come back and finish up with this. I'm going to take it under advisement --

MR. CLOHERTY: Yeah.

THE COURT: -- and then I want to turn to the issue of Mr. Glenn's transfer, the CPAP, the medical shoes --

MR. CLOHERTY: Yeah.

THE COURT: -- because I want to address that before he leaves today so he knows I'm not ignoring that, okay? So,

I'll address that when we get back.

MR. CLOHERTY: I will say I don't know if I have more to say.

THE COURT: You're pretty much done.

MR. CLOHERTY: Yeah.

THE COURT: I think we're pretty much done, but if you have any last remarks I'll let you say them.

MR. CLOHERTY: Appreciate that.

THE COURT: We'll take a short break, and then we will come back and address this issue.

THE CLERK: All rise.

(Recess taken from 3:27 p.m. to 3:45 p.m.)

THE CLERK: All rise for the Honorable Court. Please be seated.

THE COURT: All right. Any brief final comments on the suppression issues from the government?

MR. JOYCE: Your Honor, we're prepared to stand on our submission at this time. Thank you.

THE COURT: Anything else from you?

MR. CLOHERTY: Nothing else from me. I guess the -- think the Court had indicated that I would be given an opportunity for --

THE COURT: What I'll do is before the end of the day tomorrow, if you have decided, upon reflection, that you would like to supplement the record, you should file something with

the Court advising me of that fact and specifying, to the extent you can, what it is you want to add, okay? And at that point I will evaluate your request, and if it's something that can be easily submitted, and it's not completely crazy to do it, you know, I would be inclined to include it in the record. I might, if you want to put something like that in, give the government a chance to kind of cross-designate or respond one last time.

I'm hopeful we get to the end of this, but I'm trying to give you a full and fair opportunity to pursue this, and I think you'll agree I've spent a lot of time thinking about it. Usually, when I'm done asking questions lawyers are just saying to themselves, Please let me out of the courtroom, I just want to go home, because I will pick at things longer than almost anybody else will.

MR. CLOHERTY: Well, it's a privilege to be here, your Honor. But let me ask just in response to that, and I recognize -- is there any chance instead of close of business tomorrow you could give me until Monday in order for me to --

THE COURT: Get back to Mr. Glenn.

MR. CLOHERTY: I would like to visit him in person. Professionally, it's been difficult for me to do that.

THE COURT: All right. Close of the day Monday, because we're going to have to get this in.

MR. CLOHERTY: I get it. Yeah, I understand, your

Honor. I greatly appreciate it.

THE COURT: And I'm going to issue a written decision on this, because it's fairly complicated, and it's been well briefed and well argued, and I'm not saying that these arguments are frivolous, so I will -- I usually rule from the bench in suppression motions, but I'll issue a written decision on this.

MR. CLOHERTY: I'll also -- I'll certainly confer with the government before I file anything, and if I have anything that's actually to be submitted I'll confer with him.

THE COURT: By the end of the day on Monday, and use a principle of good-faith restraint. It has to be some pretty important, useful information to be justified doing it, and I'm doing it just to be sure that you've had a full and fair opportunity to explore those issues.

MR. CLOHERTY: Thank you.

THE COURT: Okay. Something else?

MR. JOYCE: I'm sorry. One other matter, your Honor. I mentioned the state court decision.

THE COURT: Yes.

MR. JOYCE: The Clerk asked me to mark it with an exhibit sticker. I've marked it as Government Exhibit 8.

THE COURT: Good. Okay. Yeah, I'll read that. For some reason I hadn't read it.

Mr. Glenn, just quickly check with your lawyer.

THE DEFENDANT: Just on that state court decision --

THE COURT: Yeah.

THE DEFENDANT: -- I defaulted, so I wasn't allowed to submit any evidence that came into this case --

THE COURT: Oh, okay.

THE DEFENDANT: -- not the -- not those, the GTL stuff. It was just -- not the policy.

THE COURT: I understand. You shouldn't worry too much about it, because I respect my state court colleagues, but I make up my own mind. On an issue of federal law my decision is controlling, not theirs.

Okay. You want out of Merrimack. They're still having problems with your CPAP. They're still having problems with your shoes.

Counsel, I'll hear you briefly on that.

I'm inclined to ask the marshals to find another place. I'm inclined to require the marshals to let him take his -- for the marshals to take, if they move him, take his CPAP, put him in a place where he doesn't have an extension cord problem, and get him the damn shoes if he doesn't have them. That's where I am on this.

MR. CLOHERTY: So maybe --

THE COURT: And that's it. Neither he nor I get to decide where somebody goes, what they go -- those are the Marshals Service, subject to only very broad discretion. I

defer to my Marshals Service, because they have all kinds of contractual issues. I think I can get him to be moved, but I'm not making any guaranties about where he's moved.

MR. CLOHERTY: I appreciate that, your Honor. So, you've already summarized what I would tell you, and I think there's a lot of frustration. I probably don't have to tell you, your Honor, a CPAP machine is a pretty serious thing, and he really ought to have access to it, and I'm not exactly sure what's going on there, but that's important. I don't want to minimize the shoes, which I think cause him a lot of pain.

THE COURT: I will speak to the appropriate personnel in the Marshals Service and say that -- I would ask them to consider transferring Mr. Glenn --

MR. CLOHERTY: Okay.

THE COURT: -- and I would strongly recommend that anyplace he be transferred to that his CPAP should go with him, and it should be usable where he is.

And what is the latest on the shoe issue? Does he have the shoes, but they're not adequate, or what is the latest?

THE DEFENDANT: Your Honor, the latest on the shoes is, is that it's deliberate indifference. I have a medical order that came from the doctor. They tried to do an end-around using a nurse practitioner, because they didn't want to give me my medical-grade shoes. I'd then seen the doctor

again. The doctor ordered it again. I think those submissions, they've gone into the court record already. And it's kind of like a tug of war. I don't think this is an issue where the marshals think me having my sneakers -- because if you walk into the Merrimack County Jail, all inmates that walk in off the streets, as long as their shoes aren't black and they're not boots, you get your shoes. Mine were sent from a medical Nike vendor, and they won't give them to me because they say they're not allowed from vendors, but I don't think it's a thing of the marshals not wanting to give them to me.

THE COURT: Do they have any metal in them or something like that?

THE DEFENDANT: No metal.

THE COURT: No?

THE DEFENDANT: They're sterile, all white. Like, the first time they denied me they said, even though they were white, they had a black sole, so we had them sent from the vendor all white, sterile. They still won't give them to me.

THE COURT: I will speak to the Marshals Service personnel, but understand this: I have complete confidence in my Marshals Service. They're responsible for your safety, security and health, and they should do that, and I'm confident that they will, and I'm sorry that you've had these confusions about it. I'm not going to micromanage their work. My job is to do this stuff, the important stuff about your law, and I'm

not going to get involved every day when you have a problem, but I will do this. I will talk to them, and I will suggest that it's probably better to move on from Merrimack, and what should happen is the CPAP should go, and I'll ask about -- you say the shoes have been ordered and are there; they just won't give them to you?

THE DEFENDANT: They're sitting in my property there, and they just won't give them to me.

THE COURT: Okay. Well, I can probably get the shoes to go with, unless it's an institution where they have some special rule that I'm not -- you know, as long as there are not like -- sometimes there are shanks and things --

THE DEFENDANT: No.

THE COURT: -- that can be a weapon or something. As long as there isn't anything like that, it's basic orthotic kind of --

THE DEFENDANT: Basic orthotic, medical-grade Nike shoes. I think I've said this in the record. I have two fractures in my lower back, I have 12 herniated disks, so I'm waiting on surgery. I also have diabetic neuropathy in my feet.

What I wanted to do was Strafford County has a TC Program, which is a Therapeutic Community, and in the prison I was in the Mental Health Unit, and what guys from the jail are telling me, they said, Charlie, you should be in the -- try to

get to the -- all you need is a recommendation to get into TC. It's a Therapeutic Community. There are psychologists there. You'll be able to work better on your mental health.

I'm currently not on any medications. I've only had one ticket at the prison, at the jail, it was a minor ticket, and one informal in five months, but I'm, like, butting heads with the administration since I got here. What they're doing for everyone else they just don't want to do for me.

THE COURT: All right. If the Marshals Service -- we do have contracts with multiple facilities, and we've only got a short time left before the trial. Whatever happens when the trial is over or the case is dismissed, you're going back to the State Prison that day, okay?

THE DEFENDANT: Of course.

THE COURT: So, as quickly as I can arrange it, because we don't want to keep you in federal custody any longer than we need to.

THE DEFENDANT: Yeah.

THE COURT: We can bring you back for your sentencing. But I'll try to do what I can on this, but I ask you to try to keep -- you know, try to work with us. We'll work with you. Okay?

THE DEFENDANT: Yeah.

THE COURT: I do want to just comment, and I'm glad you're here today, and I know that whatever that issue was was

overcome, but there was an initial indication from you that you were not going to appear today, and I just want to be sure you understand I'm moving forward. You should be here, you should --

THE DEFENDANT: Oh, I want to be here, too.

THE COURT: -- be here participating, but you can't do these 11th-hour, I'm not coming into court today, because I'm moving ahead. The next time it happens I probably am just going to explain that I can't just keep continuing proceedings, you know. And so, please show up, please cooperate with the Marshals Service and understand that, if you don't appear, one of the things I'll have to consider, and, of course, I'll hear from your lawyer and all of that, is whether your voluntary decision to absent yourself from the proceedings means that you don't have a right to be present while those proceedings are ongoing. I don't want to be there on that, believe me, I don't want to be there on that, but I just want you to understand and I want you to know, I mean, you continue to work with me, I'll work with you. All right? But I won't delay the proceedings anymore. We're on a train to resolve this, and we're going to resolve it, okay?

THE DEFENDANT: Yeah.

THE COURT: So, that said, you will be hearing shortly after I've talked to the Marshal. I might not have time to do it today, but I'll do it tomorrow if I don't get to them today,

and you'll probably be hearing something about a transfer relatively quickly.

And just understand I do this all the time. I get what you're saying about Therapeutic Community. It's a good program, but I generally don't recommend people who are doing long prison sentences before release for TC, because it's an end-of-service program that usually transfers into independent-living facilities, things like that. You've got a long bid under state law to do no matter what I do here today.

But I want you to get your medical help cared for, and if you don't feel that's being accorded to you, you should talk to your lawyer, who can raise issues with the government through the Marshals Service that, if he's got a diagnosed anxiety disorder, and he believes a regular medication is routinely prescribed that's not a narcotic, it's used for the purpose of treating anxiety disorder, then maybe he should be considered for that, and you can evaluate that.

Bottom line is, where you go, because my Marshals Service has to manage all of our pretrial detainees, I defer to them except in very unusual circumstances, because they know the contract status, they know what's available, they have to work with these correctional facilities, and I'm going to defer to them except in unusual circumstances.

So, hang in there, wait a day or two. We'll get you taken care of. I think I can get the shoe issue untangled,

you'll get the CPAP thing with you, and then we will move on.

One last thing is trial scheduling. I'm going to draw the jury on the day we have identified in September for jury draw. My instinct -- even though this is a short trial, I have some things to do during that week. If I was confident that it was only going to be a one- or two-day trial I'd start, I'd pick and go immediately, but I'm thinking we should draw on that Tuesday and start the evidence on the following Monday. Is that a problem for either of you?

MR. CLOHERTY: If I can just have a second?

THE COURT: Yeah.

MR. CLOHERTY: I think I cleared the second half of September for this matter, but let me -- if I can have a moment.

THE COURT: Yeah. Take a quick look and see. And you could check back with us tomorrow if this is a scheduling issue.

MR. JOYCE: That would be a draw on September 16th and a start on the 22nd?

THE CLERK: Correct.

THE COURT: Yeah, 16th, 22nd. And I'm anticipating one to two days for trial, perhaps a third day for deliberation, so it's like a Monday, Tuesday, Wednesday I think is what we would be looking at. If we go full trial days, I think that's very reasonable.

MR. CLOHERTY: I can make that work. This matter will bump -- I have some other things but nothing that would not be bump-able.

THE COURT: Are they with federal judges?

MR. CLOHERTY: They're not with federal judges. They're with -- opposing counsel and I would be more than happy to tell them that they have to wait.

THE COURT: All right.

MR. CLOHERTY: So, I'm happy to do it.

THE COURT: If there's a problem, let me know.

MR. CLOHERTY: No.

THE COURT: I can move some things around, but I want to draw when our jury comes in that Tuesday, and then I would like to start Monday, if possible, and do Monday, Tuesday, Wednesday. I could push it a day or two either way. I don't like to go more than a week or so from the jury draw without a trial.

MR. CLOHERTY: Thank you.

THE COURT: All right. Let's plan for that. I'll look for some filing from you on or before the close of business on Monday, if you want any additional materials. Otherwise, I'll take this matter under advisement, I'll issue a written decision, I'll speak to the Marshals Service people today or tomorrow, expect some kind of a transfer, I'll do my best with the CPAP and medical-grade shoes, and then let's try

to get ready for trial. Okay? All right.

MR. CLOHERTY: Thank you, your Honor.

MR. JOYCE: Thank you, your Honor.

THE DEFENDANT: Thank you, your Honor.

THE CLERK: All rise.

(The Court and defendant exited the courtroom at 4:00 p.m.)

IN THE COURTROOM WITH THE CLERK AND COUNSEL ONLY

THE CLERK: The following is a correction to the exhibits offered at today's hearing on August 20th, 2025.

Defense Exhibit E is the sealed transcript in 16-cv-6-JD; and F is an email to the FBI regarding the Glenn matter.

MR. JOYCE: Okay.

MR. CLOHERTY: I'm good with that.

(WHEREUPON, the proceedings concluded at 4:09 p.m.)

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR, do hereby certify that the foregoing transcript constitutes, to the best of my knowledge, skill, ability and belief, a true and accurate transcription of the within proceedings.

Date: ____1/16/26________ *_/s/ Brenda K. Hancock_*
Brenda K. Hancock, RMR, CRR
(Retired)